United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 17, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-41084

MARVIN LEE WILSON,

                              Petitioner-Appellant,

versus

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                              Respondent-Appellee.

--------------------
Appeal from the United States District Court
for the Eastern District of Texas
(6:01-CV-186)
--------------------

Before DAVIS, WIENER, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

     Petitioner-Appellant Marvin Lee Wilson, a Texas death row
inmate, is before us seeking a certificate of appealability (COA)
to contest the district court's grant of summary judgment
dismissing his federal habeas corpus petition filed pursuant to 28
U.S.C. § 2254.  We deny COA.

-----

     [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**I**

**FACTS AND PROCEEDINGS**

Wilson was convicted and sentenced to death for the murder of Jerry Williams during the course of a kidnaping. See Wilson v. State, 938 S.W.2d 57, 58 (Tex. Crim. App. 1996). On direct appeal, the Texas Court of Criminal Appeals (CCA) reversed because of improper jury arguments by the prosecutor and remanded for a new trial. Id. at 58-62.

Following remand, Wilson was retried and was again convicted and sentenced to death. Wilson v. State, 7 S.W.3d 136, 139 (Tex. Crim. App. 1999). The discrete facts of Wilson's crime as reflected by the evidence were summarized by the state appellate court on direct appeal. Id. at 139-41. Wilson's conviction and sentence were affirmed on direct appeal, id. at 141-48, and he filed a state habeas application, which the CCA denied on the basis of the trial court's findings.

After exhausting his state remedies, Wilson filed the instant § 2254 petition in which he argued that (1) the trial court erred in failing to instruct the jury that if he were sentenced to life in prison, he would not be eligible for parole until he had served 35 years; (2) the statutory definition of kidnaping contained in the Texas capital murder statute is unconstitutional and overly broad; (3) the prosecutor exercised peremptory strikes in a racially discriminatory manner ("Batson claim"); (4) the State

2

violated his right to be free from an unreasonable search and seizure by introducing evidence seized pursuant to an invalid search warrant; and (5) counsel provided ineffective assistance at both the trial and appellate level ("ineffective assistance claim"). The state filed a motion for summary judgment, arguing that Wilson's claims were procedurally barred or were otherwise without merit.

The district court concluded that all of Wilson's claims were without merit, granted the state's motion for summary judgment, and dismissed Wilson's § 2254 petition. Wilson timely filed notices of appeal and a request for COA, which the district court denied.

## II

## ANALYSIS

### A. AEDPA Review

To obtain a COA, Wilson must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When, as here, the district court's dismissal is on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Determination whether to issue a COA does not involve full consideration of the merits of the habeas claims; instead, it "requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 123 S.

3

Ct. 1029, 1039 (2003).  A petitioner must prove "something more than the absence of frivolity or the existence of mere good faith," but he is not required to show that he would succeed on appeal. Id. at 1040 (quotation marks and citation omitted).  We review the district court's application of the AEDPA to the petitioner's constitutional claims and ask whether the district court's resolution of those claims was debatable among jurists of reason. Id. at 1039.

The AEDPA provides a scheme of deference to be used in reviewing claims in a state prisoner's habeas corpus petition that were adjudicated on the merits in state-court proceedings.  See 28 U.S.C. § 2254(d); see also Hill v. Johnson, 210 F.3d 481, 484-85 (5th Cir. 2000).  The AEDPA's scheme of deference for claims thus adjudicated requires a federal court to defer to the  state court's resolution of both pure questions of law and mixed questions of law and fact unless the state court's determination was "contrary to" or an "unreasonable application" of clearly established federal law as determined by the Supreme Court.  See Hill, 210 F.3d at 485 (internal quotation marks omitted); see also § 2254(d)(1).  A state court's decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06

4

(2000). A state court's decision involves an unreasonable application of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08. Factual findings by the state court are presumed to be correct in the absence of clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1).

Here, the district court found that the state habeas court's findings and conclusions were not entitled to deference under the AEDPA because the judge who presided over Wilson's habeas proceeding had not presided over his trial. Nevertheless, in addressing Wilson's Batson claim, the court did defer to the trial court's findings.

In cases governed by pre-AEDPA law, we have held that factual findings following a paper hearing by a judge other than the one who presided at trial are not entitled to the presumption of correctness. See Salazar v. Johnson, 96 F.3d 789, 792 (5th Cir. 1996)(because the state habeas judge was not the judge at the state trial, the paper hearing was not an adequate and fair hearing); Perillo v. Johnson, 79 F.3d 441, 446-47 (5th Cir. 1996) (same, but noting that a "paper hearing" conducted in a habeas proceeding by a judge other than the trial judge was not automatically prevented from receiving the presumption of correctness); Nethery v. Collins, 993 F.2d 1154, 1157 n.8 (5th Cir. 1993). We have not, however, addressed in a precedential post-AEDPA opinion, the treatment to be

5

afforded a state court's factual findings when, as here, they were based on a paper record with conflicting affidavits and different judges.[1]  We need not do so here because the resolution of that issue is not determinative of the outcome in this case:  The state habeas court's factual findings are supported by the remainder of the record and Wilson cannot rebut them.  Even if we were to review Wilson's claims de novo, we would not conclude that he has made a substantial showing of the denial of a constitutional right in connection with any of the claims we consider today.

In seeking a COA from us, Wilson has briefed only two of the claims he made in the district court, viz., the Batson claim, and the ineffective assistance claim.  In so doing, Wilson has abandoned all other claims previously advanced.  To be preserved, arguments must be briefed, Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993), and claims not adequately argued in the body of the brief are deemed abandoned on appeal.  Id. at 224-25.  Wilson is deemed to have abandoned all claims not briefed on appeal, preserving only his Batson claim and his ineffective assistance claim.

## B.   Batson Claim

Wilson argues that the prosecutor exercised peremptory strikes in a racially discriminatory manner.  The Equal Protection Clause forbids a prosecutor to challenge potential jurors solely on

---

[1]  We granted a COA on this issue in Bass v. Cockrell, No. 02-20289.  The case is now in the briefing stages.

account of their race. Batson v. Kentucky, 476 U.S. 79, 89 (1986). In Batson, the Supreme Court outlined a three-step process for evaluating defense claims that a prosecutor used peremptory challenges in a manner violative of the Equal Protection Clause: (1) A defendant must make a prima facie showing that the prosecutor has exercised his peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to articulate race-neutral reasons for striking the veniremen in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Hernandez v. New York, 500 U.S. 352, 358-59 (1991), citing Batson, 476 U.S. at 96-98.

A defendant may establish a prima facie case of discrimination solely on the basis of evidence concerning the prosecutor's exercise of peremptory challenges. Batson, 476 U.S. at 96. To do so, the defendant must show that he is a member of a cognizable racial group and that the prosecutor exercised peremptory challenges to veniremen of that group. The defendant must also demonstrate that "these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude" the veniremen on account of race. Id.; accord, United States v. Clemons, 941 F.2d 321, 323 (5th Cir. 1991).

The trial court should consider all relevant circumstances in determining whether the defendant has established a prima facie case. Factors to be considered by the trial court include a "pattern" of strikes against veniremen of the challenged racial

7

group and the prosecutor's questions and statements during voir dire and in exercising challenges. The Supreme Court expressed confidence in the ability of trial courts to supervise voir dire and determine whether the circumstances create an inference of discrimination. Batson, 476 U.S. at 96-97.

Wilson contends that the prosecution used peremptory challenges to eliminate black veniremen but accepted non-black veniremen who possessed the same characteristics as the eliminated Blacks. Accordingly, he insists the race-neutral reasons offered by the prosecutor for excusing prospective black jurors were pretextual.

In Miller-El, a case involving a Batson claim and the standard for the issuance of a COA, the Supreme Court held that "[s]ince Miller-El's claim rest[ed] on a Batson violation, resolution of his COA application require[d] a preliminary, though not definitive, consideration of the three-step framework mandated by Batson." Miller-El, 123 S. Ct. at 1040. In Miller-El, the State conceded that Miller-El had established a prima facie showing of discrimination, and Miller-El acknowledged that the State proceeded through step two of the Batson analysis by proffering facially neutral explanations for the strikes. Id. Thus, the third step presented the determinative question, i.e., whether Miller-El had carried his burden of showing purposeful discrimination. Id.

The Supreme Court held that "[i]n the context of the threshold examination [of a] Batson claim the issuance of a COA can be

8

supported by any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based," <u>id.</u> at 1041, and stated that "[i]t goes without saying that this includes the facts and circumstances that were adduced in support of the prima facie case." <u>Id.</u> The Court held that "[o]nly after a COA is granted will a reviewing court determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and ha[d] been rebutted by clear and convincing evidence to the contrary." <u>Id.</u> The Court also held that "[w]hether a comparative juror analysis would demonstrate the prosecutors' rationales to have been pretexts for discrimination is an unnecessary determination at this stage" of the appeal process. <u>Id.</u> at 1043. Rather, explained the Supreme Court, "[a]t this stage, . . . we only ask whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1), to the petitioner's <u>Batson</u> claim was debatable amongst jurists of reason." <u>Id.</u> at 1041–42.

The Supreme Court concluded in <u>Miller-El</u> that the district court erred when it "accepted without question" the fact-findings made by the state trial court and when it failed to give full consideration to the substantial evidence the petitioner put forth in support of his prima facie case, <u>id.</u> at 1042, and that we had evaluated the petitioner's application for a COA in the same way. <u>Id.</u> The Court held that such analysis was error because it

9

required the petitioner to meet the requirements for actual habeas corpus relief, rather than those needed for the issuance of a COA. Id. The Court further reasoned that rather than deciding the merits of the appeal, we should only have inquired whether a "substantial showing" of the denial of a constitutional right had been proved. Id.

When read in isolation, portions of the Court's language in Miller-El might suggest that an appellate court lacks jurisdiction to deny a COA to a petitioner based on the merits of the petition; yet the court in Miller-El also stated that the primary consideration at the COA stage is "the debatability of the underlying constitutional claim, not the resolution of that debate." Id. Further, the Court said that the "issuance of a COA must not be pro forma or a matter of course," and that a petitioner seeking a COA must prove "something more than the absence of frivolity[.]" Id. at 1040 (quoting Barefoot v. Estelle, 463 U.S. 800, 893 (1983)). Thus, the Supreme Court left open the possibility that COA may be denied if there can be no debate regarding the underlying constitutional claim under the facts as advanced by the petitioner.

In the instant case, Wilson and the State appear to agree that Wilson established a prima facie case of discrimination, and that the State presented race-neutral explanations to rebut that prima facie case. Therefore, we turn to the third step of Batson. We

examine whether Wilson has made a substantial showing that the State engaged in purposeful discrimination when it exercised various peremptory challenges.

Wilson first contends that the prosecution improperly struck Euraline Andrus because (1) "[s]he was extremely weak on the death penalty;" and (2) she had two sons who, she believed, were treated unfairly by the criminal justice system. We consider the latter justification first.

Wilson claims that this second explanation for striking Andrus was a pretext for discrimination. In support of this contention, Wilson argues that the State failed to exclude two similarly-situated jurors: John Murphy, who also felt betrayed by the legal system, and Lisa Ann Phillips, who had friends and family who were serving time.

Contrary to Wilson's contentions, Andrus (who was stricken), Murphy, and Phillips (who were not) did not have the same or similar attitudes about the criminal justice system. Murphy felt "betrayed" by it, not because he or someone else he knew had been treated unfairly, but because "[l]ife in prison" did not mean "life" but some lesser sentence ("15, 20 years; and then they get paroled"). Murphy related that when he sat on a jury previously, the jurors were under the impression that the defendant was to be sentenced to life, only to find out later that he would probably receive a lesser sentence. He stated that he and the other jurors felt "betrayed."

11

Phillips admitted that she had friends and family in the penitentiary; however, unlike Andrus, Phillips expressed no animosity towards the justice system or the prosecutors who participated in their cases; whereas Andrus felt that her sons had been treated unfairly by the arresting officer and the district attorney's office.

Wilson has failed to demonstrate that Andrus, Murphy and Phillips were similarly situated. As a result, it seems clear that the State's second asserted justification for excluding Andrus (her attitude toward the criminal justice system) was a legitimate, race-neutral explanation. Therefore, without even examining the State's other justification for striking Andrus (her attitude toward the death penalty), we can conclude that Wilson has not made a substantial showing that the exclusion of Andrus was discriminatory. See Moore v. Keller Indus., 948 F.2d 199, 202 (5th Cir. 1991) (concluding that "because multiple reasons led [the defense] counsel to strike [two jurors] the existence of other jurors with some of their individual characteristics does not demonstrate that the reasons assigned were pretextual"); see also Alverio v. Sam's Warehouse Club, Inc., 253 F.3d 933, 941 (7th Cir. 2001) ("[W]here a party gives multiple reasons for striking a juror, it is not enough for the other side to assert that the empaneled juror shares one attribute with the struck juror.").

12

Wilson next contends that the State violated <u>Batson</u> when it struck Tammy Ruffin because she was too anxious to serve on the jury, but failed to strike Kellie Meaux, Robert Huckaby, Viole Willis, Jack Oliver, Clifford Tomplait, Christine Thompson, or Michael McFarland, each of whom expressed a desire to serve on the jury. Our review of the record satisfies us that Ruffin did not have the same or similar attitude toward serving as did the other seven identified by Wilson.

Ruffin, who was stricken, acknowledged that she did not believe in the death penalty, but went on to explain that she wanted to serve on the jury because she was a "starting paralegal" and that she was "trying to learn certain things." In contrast, Meaux, who professed a belief in the death penalty, stated that she did not "have a problem with being on the jury." Likewise, Huckaby, who also expressed a belief in the death penalty, said that although he did not particularly want to serve on the jury, he understood that it was his "duty to serve" and that he "believe[d] in that." And, Willis, another acknowledged believer in the death penalty, declined the opportunity to be excused on account of his age, explaining that he believed that it was his "civic duty" to serve on a jury and that "anytime that you're asked to serve your community that you should do so." Oliver, another proponent of the death penalty, explained that the reason he wanted to serve on the jury was that he thought more people "ought to try to serve on a jury instead of trying to avoid it" and that he had the "time and

13

know-how to do it." Thompson, who considered the death penalty to be warranted in certain cases ("if a person messes with a child, that, to me, deserves a death penalty"), was asked whether she wanted to serve on the jury, to which she responded somewhat equivocally, "I think so."

Tomplait, yet another death penalty proponent, stated that he was willing to serve on the jury if he were needed because he is "retired" and "available," in contrast to some others for whom "it would be a hardship on them." He explained further that he was an "American and [that] we have a jury system and the jury system is made up of citizens." Tomplait also ventured the belief that it was his responsibility to serve and that he "always tried to be a responsible person." McFarland, too conceded a belief in the death penalty, relating that he was willing to serve on the jury "more so than not" and explaining that he had never served on a jury before and that he would not take jury service lightly because a "man's life [was] at stake." Although McFarland said that he did not necessarily want to participate in a process that could result in the death of another individual, he understood that it was his civic duty and he was willing to do that.

Regarding Ruffin, Wilson appears to confuse the desire to sit on the jury for her own purposes, i.e., to learn about the law,

with the desires of the other seven veniremen to fulfill their civic duties. Ruffin is not comparable to these other veniremen.[2]

In Wilson's next Batson claim he asserts that the State committed a violation when it struck Cynthia Robertson because she was equivocal about the death penalty and her job exposed her to "fact situations that causes inmates to go to the penitentiary," but failed to strike Lattell Guidry whose answers on the jury form were equivocal with regard to the death penalty and whose drug counseling clients often went to prison. We do not view these two potential jurors as being sufficiently similar for purpose of a Batson comparison.

Robertson and Guidry did not have similar beliefs about the death penalty. Although both said that they believed in the death penalty, only Robertson stated that she did not want to have any part in the death-penalty process and did not want to be on the jury. Even though Guidry initially said that she did not want to be a part of the trial process, she ultimately decided that she could participate and fulfill her civic duty. It is true that both

---

[2] Furthermore, the State offered two additional reasons for striking Ruffin: She does not believe that a first degree felony is a serious crime, and she appeared to be "too immature mentally to understand the seriousness of this trial." Wilson does not suggest that these additional reasons are pretextual; in fact, both age and the prosecutor's belief that a juror would have trouble understanding the complexities of the case have been recognized as legitimate reasons for peremptorily striking a potential juror. Clemons, 941 F.2d at 325 (age); United States v. Hinojosa, 958 F.2d 624, 632 (5th Cir. 1992)(trouble understanding the complexities of the case).

15

hold jobs that bring them in contact with the criminal element, but Robertson works in the prison system whereas Guidry is a drug counselor. Accordingly, Wilson's attempt to compare Guidry and Robertson in support of his <u>Batson</u> claim fails.

Wilson next contends that the State violated <u>Batson</u> when it offered an additional reason for striking Robertson, i.e. for not knowing that the trial consisted of two phases (the guilt/innocence and punishment phases), but failed to strike Dianna Kasper, who was also unaware of the different phases. Wilson's attempt to compare Kasper and Robertson fails to provide support for his <u>Batson</u> claim. Even after being questioned by the State and defense counsel, Robertson still exhibited a lack of sufficient understanding of the murder trial process. For example, Robertson was initially unaware of the fact that the jury could convict Wilson of the lesser-included offense of kidnaping, and the rule that the defendant never has the burden of proof. Robertson also indicated that, notwithstanding a defendant's constitutional right not to testify, she would like to hear from the defendant during trial.

In contrast, Kasper had a much more sophisticated understanding of the trial process. She said that she was aware that Wilson could be convicted of the lesser-included offense of kidnaping and that she did not expect the defendant to testify. It is apparent from the record that the State's decision to strike Robertson, but not Kasper, does not constitute evidence of discrimination. The prosecutor's belief that Robertson had trouble

16

understanding the complexities of the case is a race-neutral reason for removing her from the jury.  Hinojosa, 958 F.2d at 632.

Continuing, Wilson next asserts that the State improperly struck Joseph Tackwood because (1) he did not understand the difference between guilt beyond a reasonable doubt and guilt beyond all doubt, (2) he wore dark sunglasses, and (3) he had never thought about serving on the jury, even after the general voir dire.  Wilson claims that first reason given by the State was a pretext for discrimination.  Wilson relies on the fact that the State did not strike Xuan Duong and Viole Willis, non-African-American veniremen, who (according to Wilson) also expressed confusion about the concept of guilt beyond a reasonable doubt.

We need not determine whether Tackwood, Duong, and Willis had similar difficulties understanding the State's burden of proof.  As we have seen, the State had alternative reasons for striking Tackwood from the jury.  Tackwood's appearance (wearing dark sunglasses) and the prosecutor's inability to make eye contact ("I couldn't see his eyes") are legitimate, race-neutral grounds for a peremptory strike.  See United States v. Bentley-Smith, 2 F.3d 1368, 1374 (5th Cir. 1993)(challenges may be based on subjective factors such as lack of eye contact); Clemons, 941 F.2d at 324-25 (juror's physical appearance is a legitimate basis for a peremptory strike).  Wilson does not contend that these rationales applied to any other juror.  Because the State clearly had a race-neutral

17

rational for striking Tackwood, Wilson cannot make a substantial showing that the exclusion of Tackwood was racially discriminatory. See Moore, 948 F.2d at 202.

Although Wilson next complains about the striking of Lois Hayward, who is black, he concedes that she was struck for medical reasons. Wilson likewise contests the State's proffered reasons for striking Alfred Thomas: that he did not believe in the death penalty and that he knew Wilson's wife and considered her to be truthful. And Wilson complains of the State's striking Mary Nixon for refusing to say where her husband worked, for being combative and abrupt with both State and defense counsel, and for displaying an attitude that was not conducive to working with 11 other people. Wilson does not now contend, however, that the use of these peremptory strikes violated Batson; neither does he attempt to draw any similarities between Thomas and Nixon on the one hand and, on the other hand, the veniremen who were not stricken.

Wilson does insist that the State violated Batson when it struck Fay Gabriel for having served on a hung jury, yet failed to strike Dianna Kasper who also had served on a hung jury. The prosecutor explained the difference: Gabriel was stricken because she appeared to be "very proud of the fact that she hung that jury up." Contrary to Wilson's contention, Gabriel and Kasper did not exhibit the same or similar attitude. Gabriel volunteered that in her prior jury service, she had "held out" for a not guilty

18

verdict, causing the judge to declare a mistrial. Kasper, in contrast, did not claim to be the juror whose vote produced the hung jury. Moreover, a prosecutor's perception of a venireman as strong-willed and obstinate, and the prosecutor's belief that a venireman might not engage in meaningful deliberations, are legitimate grounds for a peremptory strike. <u>Washington v. Johnson</u>, 90 F.3d 945, 954 (5th Cir. 1996).

In sum, Wilson has failed to make a substantial showing of the denial of a constitutional right with regard to his <u>Batson</u> claim. Accordingly, COA is denied on it.

## C.    Ineffective Assistance Claim:   Trial Counsel

To demonstrate that he received ineffective assistance at trial, a defendant must show, under the two-prong test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), that counsel's assistance was deficient <u>and</u> that the deficiency prejudiced his defense. A failure to establish either deficient performance or resulting prejudice defeats the claim. <u>Id.</u> at 697. To demonstrate a deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 687. To demonstrate prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, <u>id.</u> at 694, and that counsel's errors were so serious

19

that they rendered the proceedings unfair or the result unreliable. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). As claims of ineffective assistance of counsel involve mixed questions of law and fact, they are governed by the standards set forth in § 2254(d)(1). See Briseno v. Cockrell, 274 F.3d 204, 206-08 (5th Cir. 2001).

Wilson argues first that his trial counsel was ineffective for failing "to gather the probable cause affidavits that were a matter of public record." He insists that in one of the probable cause affidavits, there is a reference to an individual named "Gun." Wilson contends that "Gun" was a member of a gang called the Bloods.

This claim is at best conclusional. Wilson fails entirely to explain how counsel's failure to gather the affidavits and to ascertain that one or more of them contained references to "Gun" would have altered the outcome of trial. Conclusional allegations of ineffective assistance of counsel are insufficient to establish habeas relief. Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000). Here the defense was well aware of "Gun," knew that the search warrant referenced someone with the nickname "Gun," and knew that "Gun" was, or might have been, a member of the Bloods. This claim is without merit.

Wilson next advances a one-sentence argument that his trial counsel was ineffective for failing to request a charge on the lesser-included offense of murder. In a capital case, the jury

20

must be permitted to consider a verdict of guilt of a noncapital offense when the evidence presented would support such a verdict. Beck v. Alabama, 447 U.S. 625, 634-38 (1980). Accordingly, a "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Id. at 635 (citations omitted); see Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir. 1988). In Beck, the Court reasoned that precluding the jury from convicting a defendant of a non-capital offense, thereby forcing either conviction of a capital offense or acquittal, undermines the reliability of the jury's verdict. Beck, 447 U.S. at 637, 642-43. The mandatory instruction on a lesser included noncapital offense provides a third option as a safeguard against the risk of an "all or nothing" jury verdict on the capital offense. Id.; see also Spaziano v. Florida, 468 U.S. 447, 455 (1984).

We have held that when a claim turns on application of state law rather than federal law, a jury instruction on lesser included offenses is mandated if, under state law as applied to the facts of the case, a rational juror could vote to convict the defendant of the lesser offense and to acquit on the greater. Hill v. Black, 932 F.2d 369, 374 (5th Cir. 1991). In Texas, murder is a lesser included offense of capital murder. TEX. PENAL CODE ANN. § 19.03(c). Nonetheless, Wilson has failed to direct our attention to any evidence in the record that would support a verdict of murder.

21

Wilson's bald assertion that a lesser-offense instruction was warranted is insufficient to earn him habeas relief. See Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) (conclusional allegations insufficient to warrant § 2254 relief). As Wilson cannot show that he was entitled to a lesser-included-offense instruction, he fails to demonstrate that counsel was ineffective for failing to request such an instruction.

Furthermore, a lesser-included-offense instruction for murder would have been inconsistent with the defense theory that Wilson did not murder Jerry Williams; that instead he was killed by "Gun" or someone else at "Gun's" direction. Thus, in addition to lack of entitlement, the failure of counsel to request a murder instruction was a legitimate strategic choice, on its own sufficient to eschew deficient performance. See Turner v. Johnson, 106 F.3d 1178, 1187 & n.40 (5th Cir. 1997).

Wilson's next ineffective-assistance claim is that trial counsel performed deficiently when he "showed up at jail and improperly pressured a material witness to change his story." Wilson contends that this "evidence was repeatedly argued by the State during its closing arguments." Wilson confusingly argues that the "fact that the jury was to consider future dangerousness when coupled with these jailhouse visits, surely prejudiced" his rights.

Following the homicide, the material witness, Lavergne, identified Lewis in a photographic line-up and told law enforcement

22

agents that the man he identified in the photo was the "'helper'" rather than the "primary actor." Wilson, 7 S.W.3d at 140. According to Lavergne, the other man, who Lavergne described as having a "'gerry curl,'" made the threats and conducted most of the beatings. When the same photograph of Lewis was shown to Lavergne at trial, however, he testified that the person pictured was the one with the gerry curl and hence the primary actor, even though Lavergne had identified Lewis as the "helper" rather than the primary actor when he was shown the picture of Lewis at Wilson's first trial.

This contradiction in Lavergne's testimony prompted further questioning which eventually revealed that defense counsel had visited Lavergne three times while he was in jail on an unrelated offense. This revelation allowed the State to suggest that defense counsel had pressured Lavergne to change his testimony with regard to who was the primary actor. The State was also able to elicit the facts that (1) outside the presence of the prosecutor, defense counsel had shown Lavergne a photographic line-up; and (2) Wilson was present on this occasion and asked Lavergne for his father's name and whether he had a new baby. Lavergne testified that Wilson's questions scared and intimidated him "[a] little bit." Defense counsel's meetings with Lavergne were reiterated during the State's closing arguments.

Even if we assume that Wilson's trial counsel had attempted to alter Lavergne's testimony, Wilson does not argue that, but for

23

counsel's engaging in such behavior, he (Wilson) would not have been found guilty of capital murder or, even if found guilty, he would not have been sentenced to death. All that Wilson asserts is the bald conclusion that his "rights" were "prejudiced." In addition, Wilson's argument —— that counsel's jailhouse visits, when coupled with the issue of future dangerousness, established prejudice —— is nonsensical. Again, conclusional allegations of prejudice are insufficient to establish ineffective assistance of counsel. See Green v. Johnson, 160 F.3d 1029, 1041 (5th Cir. 1998).

Wilson next insists that the "biggest error occurred when defense counsel performed an in-court comparison" of Wilson and "Gun." Trial counsel had "Gun" stand next to Wilson, apparently to show how similar they looked and to suggest that "Gun," not Wilson, had killed Williams. This ploy appears to have backfired when the State proved that "Gun" had been in jail at the time of the murder and obviously could not have killed Williams.

It also appears, however, that defense counsel was aware that "Gun" was in jail at the time of the shooting yet, for whatever reason, made the tactical decision to conduct the in-court comparison. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir. 1997). Accordingly, this claim fails to establish the deficient-performance prong of Strickland.

24

Finally, Wilson claims that, cumulatively, the sum of trial counsel's errors rendered his conviction and sentence constitutionally unreliable. As reflected by the foregoing analysis, however, Wilson has failed to demonstrate either deficiency or prejudice with regard to any of trial counsel's professional assistance; and absent specific deficiency and prejudicial performance, there can be no cumulative ineffective assistance of counsel.

We deny COA on Wilson's claim of ineffective assistance of trial counsel claim.

**D. Ineffective Assistance Claim: Appellate Counsel**

The <u>Strickland</u> standard also applies to claims of ineffective assistance of appellate counsel, and Wilson must show both that his appellate attorney's errors constituted deficient performance and that his case was prejudiced as a result. <u>See</u> <u>Williams v. Collins</u>, 16 F.3d 626, 635 (5th Cir. 1994). Wilson argues that counsel was ineffective for failing to raise the <u>Batson</u> claim on appeal. To show prejudice, Wilson must show a reasonable probability that, but for his appellate counsel's error, the outcome of his appeal would have been different. <u>Pitts v. Anderson</u>, 122 F.3d 275, 279 (5th Cir. 1997).

As we have determined that Wilson's <u>Batson</u> claim is without merit, appellate counsel cannot be found ineffective for having failed to raise it; prejudice cannot result from counsel's failure

to assert a meritless claim or make a meritless argument.  <u>See</u> <u>United States v. Wilkes</u>, 20 F.3d 651, 653 (5th Cir. 1994).

We deny COA on the issue of ineffective assistance of appellate counsel.

### III

### CONCLUSION

Wilson has failed to make a substantial showing that he was denied a constitutional right or that jurists of reason could debate the correctness of the denial of his habeas claims. <u>Miller-El</u>, 123 S. Ct. at 1040; <u>Slack</u>, 529 U.S. at 484; 28 U.S.C. § 2253(c)(2).  Wilson is therefore not entitled to a COA.

COA DENIED.