# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 16, 2011

No. 09-70022

Lyle W. Cayce
Clerk

MARVIN LEE WILSON,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:06-CV-140

Before KING, DAVIS and GARZA, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant Marvin Lee Wilson, a Texas death-row inmate, appeals the denial of his federal habeas corpus petition. The district court issued a certificate of appealability (COA) on two issues on which Wilson seeks relief: (1) that he may not be executed under *Atkins v. Virginia*[1] because he is mentally retarded; and (2) the applicability of AEDPA to that claim. We affirm.

---

[*] Pursuant to 5ᵀᴴ CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CIR. R. 47.5.4.

[1] *Atkins v. Virginia*, 536 U.S. 304 (2002).

No. 09-70022

I.

Wilson was tried, convicted and sentenced to death in April 1994 for the murder of Jerry Williams during the course of a kidnaping. Wilson's conviction was based on the following evidence as outlined by the Texas Court of Criminal Appeals.

> On November 4, 1992, Officer Robert Roberts and other police officers entered appellant's apartment pursuant to a search warrant. Jerry Williams was the confidential informant whose information enabled Roberts to obtain the warrant. Williams entered and left the apartment minutes before the police went in. Appellant, Vincent Webb, and a juvenile female were present in the apartment. Over 24 grams of cocaine were found, and appellant and Webb were arrested for possession of a controlled substance. Appellant was subsequently released on bond, but Webb remained in jail. Sometime after the incident, appellant told Terry Lewis that someone had "snitched" on appellant, that the "snitch" was never going to have the chance to "have someone else busted," and that appellant "was going to get him."
>
> On November 9, 1992, several observers saw an incident take place in the parking lot in front of Mike's Grocery. Vanessa Zeno and Denise Ware were together in the parking lot. Caroline Robinson and her daughter Coretta Robinson were inside the store. Julius Lavergne was outside the store, but came in at some point to relay information to Caroline. The doors to Mike's Grocery were made of clear glass, and Coretta stood by the door and watched. Zeno, Ware, Coretta, and Lavergne watched the events unfold while Caroline called the police. These witnesses testified consistently although some witnesses noticed details not noticed by others.
>
> In the parking lot, appellant stood over Williams and beat him. Appellant asked Williams, "What do you want to be a snitch for? Do you know what we do to a snitch? Do you want to die right here?" In response, Williams begged for his life. Andrew Lewis, Terry's

No. 09-70022

husband, was pumping gasoline in his car at the time. Williams ran away from appellant and across the street to a field.

Appellant pursued Williams and caught him. Andrew drove the car to the field. While Williams struggled against them, appellant and Andrew forced Williams into the car. At some point during this incident, either in front of Mike's Grocery, across the street, or at both places, Andrew participated in hitting Williams and appellant asked Andrew: "Where's the gun?" Appellant told Andrew to get the gun and said that he (appellant) wanted to kill Williams. They drove toward a Mobil refinery. Zeno and Ware drove back to their apartments, which were close by, and when they arrived, they heard what sounded like gunshots from the direction of the Mobil plant.

Sometime after the incident, appellant told his wife, in the presence of Terry Lewis and her husband, "Baby, you remember the nigger I told you I was going to get? I did it. I don't know if he dead or what, but I left him there to die." When Terry looked back at her husband, appellant stated, "Don't be mad at Andrew because Andrew did not do it. I did it."

On November 10, 1992, a bus driver noticed Williams' dead body on the side of a road. The autopsy report concluded that Williams died from close range gunshot wounds to the head and neck.

Having known appellant for 16 years, Zeno identified appellant. Lavergne and Coretta recognized Williams but did not know appellant or Andrew. Lavergne subsequently identified Andrew in a photo line-up.

*Wilson v. State*, 7 S.W.3d 136, 139-140 (Tex. Crim. App. 1999)(footnotes omitted).

Wilson's conviction and sentence were appealed to the Texas Court of Criminal Appeals which reversed and remanded for a new trial. *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1996) (en banc). Wilson was retried, and again

No. 09-70022

convicted and sentenced to death in 1998.  The Texas Court of Criminal Appeals affirmed.  *Wilson v. State*, 7 S.W. 3d 136 (Tex. Crim. App. 1999).

Wilson filed his first state application for a writ of habeas corpus in 1999, which was denied. *Ex parte Wilson*, No. 46,928-01 at 60, Tex. Crim. App. Oct. 11, 2000.  His first federal petition for writ of habeas corpus and his request for COA were denied as well. *Wilson v. Cockrell*, No. 6:01-CV-186 (E.D. Tex. July 11, 2002); *Wilson v. Cockrell*, 70 Fed. Appx. 219 (5th Cir. 2003).

While the original federal habeas petition was pending, the Supreme Court decided *Atkins*.  Wilson filed a second state writ raising an *Atkins* claim.  The state trial court recommended that relief be denied.  The Texas Court of Criminal Appeals adopted those findings and denied relief. *Ex parte Wilson*, No. 46,928-02 (Tex. Crim. App. Nov. 10, 2004).   Evidence gathered in the habeas proceedings as to whether Wilson is mentally retarded will be discussed below.

This court granted Wilson's motion for authorization to file a successive petition. *In re Wilson*, 442 F.3d 872 (5th Cir. 2006).  The district court denied federal habeas relief.  However, it granted COA on three issues:  (1) that Wilson may not be executed because he is mentally retarded; (2) that the government must bear the burden of proving that he is not mentally retarded to a jury; and (3) the applicability of AEDPA to those claims.  In this appeal, Wilson has divided issue (1) into two parts - unreasonable determination of the facts and unreasonable application of the law applicable to the question of mental retardation.   Wilson concedes that issue (2) is foreclosed by this circuit's precedent. *United States v. Webster*, 421 F.3d 308, 311-12, 312 n.11. (5th Cir. 2005).   Wilson also concedes that the question of whether § 2254(e)(1)'s "clear

4

No. 09-70022

and convincing" standard is to be used for § 2254(d)(2)'s unreasonableness review is foreclosed. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

This leaves three issues in this appeal: (1) whether the state habeas decision that Wilson is not mentally retarded is an unreasonable determination of the facts in light of the state record; (2) whether the state habeas decision resulted in an unreasonable application of clearly established law as determined by *Atkins*; and (3) whether the federal district court erroneously applied the AEDPA deference framework instead of deciding Wilson's claim *de novo*.

## II.

Wilson's petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a conclusion that is contrary to federal law clearly established in the holdings of the Supreme Court; or that involves an unreasonable application of clearly established Supreme Court precedent; or that was based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); 28 U.S.C. § 2254(d)(1)-(2).

## III.

Wilson argues that he is mentally retarded and that his execution would violate *Atkins*. In *Atkins*, the Supreme Court held that execution of criminals who were mentally retarded constituted cruel and unusual punishment in violation of the Eighth Amendment. 536 U.S. at 307. The characteristics of mental retardation that warrant the ban were described as follows:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their

5

No. 09-70022

impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies  do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318 (footnotes omitted).

Characteristics of the mentally retarded that make the death penalty an unsuitable punishment for their crimes were also discussed in the Court's analysis of whether the purposes of the death penalty, particularly deterrence, could be served by executing a mentally retarded offender.

The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable -- for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses -- that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Id.* at 320.

The Supreme Court acknowledged that any disagreement concerning the execution of mentally retarded offenders related to determining who is in fact retarded. "Not all people who claim to be mentally retarded will be so impaired

6

No. 09-70022

as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317.  Accordingly, it left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986))..

In the absence of action by the Texas legislature setting a definition of mental retardation for this purpose, the Texas Court of Criminal Appeals adopted the definitions set by the American Association on Mental Retardation (AAMR) or section 591.003(13) of the TEX. HEALTH & SAFETY CODE, which are substantially similar.  *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).

> Under the AAMR definition, mental retardation is a disability characterized by: (1) "significantly subaverage" general intellectual functioning; (2) accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. . . . [T]he definition under the Texas Health and Safety Code is similar: "'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."

*Id.* at 6.   The AAMR definition was specifically cited by the Supreme Court in *Atkins* as one of the definitions used in that case.  536 U.S. at 308, n.3.

Because the second element, which looks to adaptive deficits, is subjective and an area on which experts could be found to opine on both sides of the issue in many cases, *Briseno* also lists several evidentiary factors which factfinders might also consider when weighing evidence to determine whether it indicates mental retardation versus a personality disorder.

7

No. 09-70022

. Did those who knew the person best during the developmental stage--his family, friends, teachers, employers, authorities--think he was mentally retarded at that time, and, if so, act in accordance with that determination?

. Has the person formulated plans and carried them through or is his conduct impulsive?

. Does his conduct show leadership or does it show that he is led around by others?

. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

. Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

. Can the person hide facts or lie effectively in his own or others' interests?

. Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W. 3d at 8-9 (the *Briseno* factors).

Wilson argues that the district court erred in determining that the state court reasonably determined the facts in light of the record under 28 U.S.C. § 2254 (d)(2). Wilson also argues that the state court unreasonably applied *Atkins* because its decision unreasonably substituted the above listed *Briseno* factors for the clinical definition of mental retardation. Finally, Wilson argues that remand is required for the district court to reconsider his claims *de novo*, because no §2254(d)(2) deference is due to implicit state habeas findings.

No. 09-70022

A.

We first consider whether the state court's decision represents an unreasonable determination of the facts. Whether a defendant is mentally retarded is a question of fact. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006). Under AEDPA, a state court's factual findings are presumed to be correct, unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). This presumption applies to facts that may be implied from express findings of the state court. *Marshall v. Lonberger*, 459 U.S. 422, 433-434 (1983)(finding of voluntariness of confession implicit in other findings made by state court.); *LaVallee v. Delle Rose*, 410 U.S. 690, 695 (1973)(trial court would have granted relief sought by the defendant had it believed the defendant's testimony, therefore failure to grant relief was the equivalent of an express finding against the credibility of the defendant.) "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair[] support' in the record." *Marshall*, 459 U.S. at 432.

The following evidence was presented in two hearings during the state habeas proceedings. Wilson presented school and prison training records, including standardized testing results. Five I.Q. scores are reflected in those reports. The first I.Q. test, the Lorge-Thorndike, was administered by Wilson's school when he was approximately 13 years old. Wilson's full-scale score on this test was 73. At age 29, Wilson was given an I.Q. test by the Texas Department of Criminal Justice and scored 75. In April 2006, when Wilson was 46 and during the post-conviction proceedings, Wilson scored 61 on the WAIS III I.Q.

test.  On further testing by the defense, Wilson scored 75 on the Raven Standard Progressive Matrices and 79 on the TONI-II I.Q. tests.  A score of 70 or below supports a finding of mental retardation.

Wilson relies heavily on the report of his expert Dr. Ronald Trahan.  At the time the district court denied federal habeas relief to Wilson it did not have the entire state habeas record before it.  In particular, it did not have Dr. Trahan's report.  However, the district court did receive and review those records in conjunction with Wilson's Motion for Relief from Judgment under Rule 60(b). In response to that motion the district court did not change its conclusion on Wilson's habeas petition and found that the state's adjudication of Wilson's application for writ of habeas corpus was neither contrary to nor the result of an unreasonable application of clearly established federal law as established by the Supreme Court and was not based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, the motion  was denied.   We see no reason to follow Wilson's suggestion to vacate and remand with instructions for the district court to consider the state court's decision in light of the complete state record.   In addition, our review of the district court's judgment is *de novo* and we conclude that the state court records (including Dr. Trahan's report) support the state court's factual findings.

Dr. Trahan administered several standardized intelligence tests, reviewed Wilson's prior scores and school records and interviewed him for eight hours.  He also reviewed affidavits of Wilson's family members and friends and interviewed Wilson's mother-in-law.  Dr. Trahan concluded that Wilson was mentally retarded.  He testified that the score of 61 on the  WAIS-III was the most valid

No. 09-70022

indicator of adult intelligence in current usage and that he would rely most heavily on that result. He also testified that the score on the TONI-II and Raven tests he administered are commonly 10 to 15 points higher than those obtained on the WAIS-III. Dr. Trahan also concluded that Wilson suffered from adaptive deficits in several areas and that, based on information from Wilson's family and friends and his school records, his condition was evident before age 18.

The state court's opinion highlighted the evidence that it relied on that indicated that Wilson is not mentally retarded. First, Wilson never urged that he was mentally retarded as mitigating evidence in either of his two capital murder trials or in his first application for habeas relief.

Next, addressing the *Briseno* factors, the state court concluded that at most Wilson's family members and acquaintances considered him slow during the developmental stage. Also the court found that he worked at several jobs, had a drivers license, married and had a child. The trial evidence indicated that Wilson was able to formulate a plan and carry it out, as evidenced by his role in the crime in this case. Wilson made a plan to kill the victim because he believed that the victim had informed on him to the police. The evidence at trial did not indicate that Wilson was a follower and his response to his belief that the victim had informed on him was deliberate, rational and appropriate, if unwise and illegal. The person who administered the WAIS-III test testified that Wilson's responses to questions were coherent, rational and on point. Every *Briseno* factor was found against the defendant's claim of mental retardation.

The state court next addressed the clinical factors of intellectual impairment, adaptive deficits and onset prior to age 18. On the issue of intellectual impairment the state court's habeas opinion focuses on the fact that

11

No. 09-70022

all of the defendant's I.Q. test results in the record are above 70 with the exception of the 61 on the WAIS-III test, which was administered during the course of the habeas proceedings.  The state court's opinion quotes extensively from the state's cross-examination of Wilson's expert Dr. Trahan, challenging Dr. Trahan's reliance on his assumption that the WAIS-III was administered by a "well-respected and well-trained psychologist" when in fact the test was given by an intern and Dr. Trahan conceded that no records were available to indicate Wilson's motivation, attentiveness or cooperativeness or the test surroundings. We agree with the district court that based on these statements the state court declined to credit Dr. Trahan's testimony and implicitly found that Wilson did not suffer from intellectual deficits or an I.Q. of about 70 or below as is required to establish mental retardation.

The state court next addressed adaptive deficits and age of onset in a single paragraph.[2]  Referring to its previous analysis, the state court noted that Wilson "functioned sufficiently in his younger years to hold jobs, get a drivers license, marry and have a child," indicating that the state court concluded that Wilson did not suffer from related adaptive deficits.  Also, the state court stated that although Wilson did poorly in school, the record reflects that he seldom went to class, and although he was considered "slow" by most, there is nothing in the record to reflect that Wilson was ever diagnosed as mentally retarded prior to age 18.  We agree with the district court that the state court implicitly

---

[2] Wilson argues that the state courts analysis of adaptive deficits is blank indicating a defect in its analysis.  However, the heading in the state court's opinion, which reads "b. Accompanied by related limitations in adaptive functioning **and** c. The onset of which occurs prior to the age of 18," (emphasis added), clearly indicates that the state court considered adaptive deficits in conjunction with age of onset.

No. 09-70022

found that Wilson did not suffer from adaptive deficits related to mental retardation and that the condition did not manifest prior to age 18.

The state court stated

> The defendant has the duty and burden to demonstrate by a preponderance of the evidence that he is mentally retarded. While there is some evidence to support that conclusion, the overwhelming weight of the credible evidence indicates that he is not.

Although other  factfinders might reach a different conclusion as to whether Wilson is mentally retarded on the evidence before the state habeas court, on this mixed record, Wilson has failed to overcome the presumption of correctness that attaches to the state court's factual findings which are fairly supported by the record.

### B.

Clinical definitions of mental retardation require proof of intellectual deficits accompanied by adaptive deficits which onset prior to age 18.  We turn next to Wilson's argument that the state court unreasonably applied *Atkins* because its decision unreasonably substituted the *Briseno* factors for the clinical adaptive deficits criteria.  Wilson also argues that even if the  *Briseno* factors may substitute for clinical factors, the state habeas court still unreasonably applied *Atkins* because it did not apply the *Briseno* factors as originally designated in *Briseno* – that is to distinguish adaptive deficits caused by mental retardation from adaptive deficits caused by some other condition.  135 S.W. 3d at 8-9.

The Supreme Court in *Atkins* "[left] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17

No. 09-70022

(1986)).  Although the Court did refer to the clinical definitions of mental retardation promulgated by the AAMR and the American Psychiatric Association ("APA"),

> *Atkins v. Virginia* . . . did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation "will be so impaired as to fall [within Atkins' compass]." We "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction."

*Bobby v. Bies*, 129 S. Ct. 2145, 2150 (2009).  Therefore it is not "clearly established Federal law as determined by the Supreme Court of the United States" that the analysis by the state court must precisely track the clinical definitions referenced in *Atkins*.  *See* 28 U.S.C. § 2254(d)(1); *Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006)(It is not clearly established federal law that the state court analysis of subaverage intellectual functioning must precisely track the AAMR's recommended approach).

Also, based on our review of the state court's analysis, it is clear that the state court did not abandon the clinical factors in the AAMR's definition of mental retardation or substitute the *Briseno* factors for the clinical mental retardation definition.  In fact, as discussed previously, the state court outlined its view of the evidence on intellectual deficits, adaptive deficits and age of onset in separate sections.  Its analysis of the *Briseno* factors, whether standing alone or as incorporated into its conclusions on the clinical factors of adaptive deficits and age of onset, is not an unreasonable application of *Atkins*.

C.

AEDPA requires that reviewing courts defer to state decisions unless factually or legally unreasonable.  28 U.S.C. § 2254 (d)(1) and (d)(2).  Wilson argues that this court should vacate and remand for *de novo* review by the

district court (or reverse and render) because no deference is due to the state court's implicit findings on intellectual impairment, adaptive deficits and developmental onset. Also, Wilson argues that no deference is due to the state court's decision on his *Atkins* claim because the state procedure did not adequately test the clinical evidence of mental retardation.

For his argument that no deference is due to the state court's implicit factual findings on the individual components of the clinical test for mental retardation, Wilson relies on *Rompilla v. Beard*, 545 U.S. 374, 391 (2006), and *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Both of these cases involved issues not addressed by the state habeas court. In this case, the state court addressed each of the elements of mental retardation either directly or indirectly and made an explicit finding that Wilson had failed to meet his burden of proof on the issue of mental retardation. The state court's factual findings are statutorily entitled to the presumption of correctness and deferential review. 28 U.S.C. § 2254(e)(1).

Wilson argues that the state procedure was inadequate because the state elected not to counter his expert Dr. Trahan with a report by a competing expert, implying that the state court's findings cannot be considered reasonable unless at least one expert was presented on each side of the question. The state court as factfinder is not required to credit the testimony of an expert, which as the court's opinion reflects, it did not do in this case. Wilson bases this argument on *Panetti v. Quarterman*, 551 U.S. 930 (2007). However, he raised this issue in a motion to alter or amend the judgment after the district court ruled. The district court properly determined that it is not appropriate to grant relief under these circumstances because the argument could and should have been raised before judgment issued. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005), *cert.*

No. 09-70022

*denied*, 549 U.S. 1166 (2006).  Further, to grant the relief Wilson requests, this court would have to extend the holding of *Panetti* from requiring a fair hearing on the issue of mental retardation, which Wilson clearly received, to shifting the burdens of production and presentation of evidence to the state.  We decline the invitation to do this.

## IV.

For the foregoing reasons, the district court's judgment denying Wilson's petition for writ of habeas corpus is AFFIRMED.