Affirmed and Memorandum Opinion filed July 22, 2008








Affirmed and Memorandum Opinion filed July 22, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00554-CR

____________

 

SALVADOR ZAVALA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 228th
District Court

Harris County, Texas

Trial Court Cause No. 954730

 



 

M E M O R A N D U M   O P I N I O N

Salvador Zavala was convicted of murder and sentenced to
confinement for life in the Texas Department of Criminal Justice, Institutional
Division.  Zavala challenges his conviction, asserting that the evidence was
legally and factually insufficient to support the verdict.  We affirm.








I.  Factual and Procedural Background

On the evening of July 2, 2003, a tow-truck driver was
returning home after his shift when he noticed a truck stopped on the road.  He
did not see anyone near the truck and decided to stop to see if he could render
aid.  After seeing Aa Hispanic man with his eyes halfway open
and halfway shut@ in the truck=s cab, the
tow-truck driver called 911.  Officer Patterson of the Houston Police Department
testified that he received the call around 9:55 p.m., and upon arriving at the
scene, he saw a red Ford pick-up parked on the shoulder.  Inside the truck, he
first saw just one male with gunshot wounds.  Upon opening the passenger door,
he saw two more males, who had also been shot.  Officer Patterson closed the
door and secured the scene.  Officer Peters of HPD=s Homicide
Division arrived at the scene around 10:30 p.m.  He testified that Athere were three
dead men in the [truck=s] backseat,@ all gunshot
victims.  Consistent with the gunshot wounds, Officer Peters noticed Aa lot of firearms
evidence, holes and bullets.@  He also noticed that the hands of all
three men were bound.  ATwo of the men had their hands bound with
twine and the third had something similar to flex-cuffs on his hands.@  When asked to
describe flex-cuffs, he testified that they are made with Aa plastic strip,
much like an electrician would use to tie wires together.@  








Officer Duncan worked this case as a crime-scene
investigator.  He testified that upon arriving at the scene, he immediately
noticed numerous Asigns of violence.@  All three men
had been shot numerous times.  He located 14 pieces of ballistics evidence
inside the truck: three fired bullets and 11 cartridge casings.  He recovered
two calibers of cartridge casings: nine-millimeter and .40-caliber.  He
testified that it was Asafe to say that the shots were fired
inside the vehicle because all the cartridge cases were inside the vehicle.@  He was unable to
obtain fingerprints from the cartridge cases, and could not remember if he
tried to lift a fingerprint from the keys which were found near the truck.  The
truck, which was owned by a couple not related to the investigation, was towed
to a different location where it was processed.  The three men were eventually
identified as Oliver Amilpas, Juan Arturo Garcia, and Eladio Trevino.

Amilpas=s wife testified that she last saw her
husband around 8:30 p.m. on the night he died.  Earlier that day, she saw two
men arrive at her home in a black Dodge Intrepid.  Although the men stayed
outside, she was able to identify Moises Borja in a photo line-up as the
driver.  She gave a description of the passenger; however, she was unable to
choose Zavala=s picture out of a photo line-up.  Amilpas told his
wife that he was going to sell 300 pounds of marijuana that day.  A few hours
after the Intrepid arrived, a beige car, a red truck, and another black car
arrived.  

Garcia=s wife testified that her husband drove a
beige car and that after the incident, another man, Rick Soto, told her where
to find the car.  Trevino=s wife admitted that her husband had been
involved in drug trafficking for several years.  She testified that she last
saw her husband around 7 or 8 p.m. on July 2, and that he drove a black Grand
Prix.  

Maria Moreno, Amilpas=s sister,
testified that on the afternoon of July 2, she saw a Atall young man@ get out of a dark
car at Amilpas=s home.  Her brother told her that he Awas going to do
business with him.@  At trial, Moreno identified Zavala as
the man she saw with her brother. 








After the incident, Jose Aleman-Salmon, who was Amilpas=s cousin by
marriage, met with other family members at Amilpas=s mother=s house to grieve
and talk about what happened.  At this gathering, Aleman-Salmon heard that one
man seen with Amilpas on July 2 was A[t]all, wore
jewelry, short haircut, and drove a black Intrepid.@  At the time he
heard it, the description reminded Aleman-Salmon of Zavala.  Aleman-Salmon had
known Zavala for a couple of years.  He testified that the two were involved in
illegally programming and selling satellite cards and prepaid cell phones. 
Before the killing, Aleman-Salmon visited Zavala=s shop Aabout twice a week
or so.@  He testified
that he did know of anyone else working in the shop besides Zavala.  

Aleman-Salmon also knew Borja through Zavala.  On several
occasions, Aleman-Salmon saw Zavala in possession of a nine-millimeter
Beretta.  He testified that Zavala Awould always have
it on him.  Even when he was leaving the shop, he=d take it out of
the desk and put it on his waistband or put it in the backseat of the car.@  He also
testified that Zavala mentioned that he wanted to Aset up like a deal
to rob people . . . a drug deal.@  However, he
admitted that he did not think Zavala was serious.  Officer Peters investigated
the small shop where Zavala worked.  Inside the shop, Officer Peters found Aflex-like cuffs.@  He admitted that
he did not compare the flex-cuffs found in the shop to those found at the scene
to determine if they were produced by the same manufacturer.  

Dr. Dwayne Wolf performed the autopsy on Garcia and
reviewed the autopsies performed on Trevino and Amilpas.  He testified that
Trevino Ahad a ligature
around one of his wrists, specifically around the left wrist.  It was a
plastic-type ligature.@  Trevino had eight separate gunshot
wounds.  Garcia had ten separate gunshot wounds, nine perforating and one
penetrating.  Amilpas had five separate gunshot wounds. Dr. Wolf testified that
all three men were homicide victims and each died of multiple gunshot wounds.








On July 4, 2003, Officer Polzine, of the City of Rice
Police Department, stopped a Ford Windstar on Interstate 45 (Rice is about 45
miles south of Dallas on Interstate 45).  Zavala was the passenger and Borja
was the driver.  The stop occurred around 8:00 p.m. when Officer Polzine used
his radar to confirm that the van was traveling at 81 miles per hour; the speed
limit was 70.  When Officer Polzine activated his lights, his dash-video camera
came on with audio.  When Borja rolled down the window, Officer Polzine Anoticed that there
was a strong odor of what [he] believed to be marijuana.@  After asking
Zavala to step out of the vehicle, he patted Zavala down to make sure he did
not have any weapons.  As a result of the pat down, Officer Polzine discovered
marijuana in Zavala=s pocket.  Officer Polzine arrested Zavala
and handcuffed him.  He then obtained consent from Borja to search the
vehicle.  

During the search he found a loaded nine-millimeter Beretta
under the passenger seat.  He also found five bales of marijuana, totaling 178
pounds.  Additionally, he found several cell phones and a black bag with a
large amount of cash.  AIt was in three stacks approximately three
to four inches tall with rubber bands around it.  A hundred-dollar bill on top,
hundred-dollar bill on bottom and one-dollar bills all between them.@  A total of
$2,350 was recovered, including $335 found on Zavala.  In the police car,
Zavala asked Officer Polzine if it was the smell that gave them away.  When
Officer Polzine made a comment about his height, Zavala said he was 6 feet, 6
inches tall.  

A wrecker company was called to pick up the Windstar. 
Consistent with company policy, one employee drove the wrecker and one employee
drove the Windstar back to the impound facility.  The employee driving the
Windstar testified that as she was making a turn, Aa handgun fell out
from underneath the dashboard and fell onto [her] right foot.@  This handgun, a
.40-caliber Beretta, was collected and placed into evidence.  Officer Peters
eventually received the two weapons and the cell phones recovered from the
minivan, as well as the fingerprint cards for Zavala and Borja. He did not dust
the guns for fingerprints.

A member of the HPD Latent Prints Identification Division
testified that he processed the red truck inside and out.  He found four sets
of shoe prints, but they were insufficient to provide an identification.  He Adeveloped 11
fingerprints on the outside surface@ of the truck, and
lifted from one inside the truck.  After comparing those prints to the prints from
Zavala and Borja, he concluded that he had Aone identifiable
print, a left index fingerprint that matched Salvador Zavala.@  On cross, he
admitted that he did not have an entire print and that he had no way of
determining how long the print had been on the truck.  








A firearms examiner with the HPD Crime Laboratory testified
that she received a nine-millimeter Luger Beretta Model 92FS and a .40-caliber
Smith & Wesson Beretta Model 96 Centurion.  She received 16 rounds of
ammunition per firearm, and used three rounds with each firearm for test
fires.  After comparing the test fires with the bullet parts collected in the
case, she was able to confirm that all except two of the parts matched one of
the two weapons.  Of the remaining two parts, one was unsuitable for testing
and one was insufficient for testing.  She matched the majority of the bullet
parts to the nine-millimeter Beretta.  On cross, she admitted that a
nine-millimeter Beretta is a popular gun and its profile resembles that of
other models.

Next, Zavala=s former cell-mate
testified about conversations he had with Zavala.  Zavala told him that he was
there Abecause of three
deaths, three murders.@  Zavala said he was stopped in Dallas,
and that Awhen [the police] stopped him, they found a gun that .
. . was dirty. . . .  It had three murders.@  Zavala also said
that Ahe couldn=t really talk
because a lot of things were going to come out that could hurt him.@  Zavala told his
cell-mate that the sister of one of the deceased saw him with her brother Abefore I did away
with him.@  Finally, Zavala said Athat=s what happen[s]
to people that [are] involved in this type of business . . . and don=t do the business
the way they should do it.@  Zavala=s former cell-mate
admitted that he was in jail for a felonyCtampering with a
government instrumentCand that he had another case pending for
possession of cocaine.  He also admitted that he came to the United States
illegally, had a history of criminal offenses on his record, and was receiving
leniency in return for his testimony.         








Finally, Zavala=s mother testified
that Borja drove a black car similar to Zavala=s car.  She also
testified that sometime before July 2, 2003, Zavala asked to borrow her van
because his Intrepid was making noise.  According to Zavala=s mother, Zavala
was driving the Windstar on July 2.  She never saw a firearm or pistol in
Zavala=s room or at his
shop.  She also testified that her son called her at 9:00 p.m. on July 2 and
that there was music in the background.  On cross, she admitted that she did
not know where her son was, what he was doing, or whom he was with when she
received the phone call.  

After being indicted, Zavala entered a plea of not guilty
and was tried by a jury.  The jury found Zavala guilty of capital murder and
the court assessed punishment at confinement for life in the Texas Department
of Criminal Justice, Institutional Division.  This appeal followed.

II.  Analysis

A person commits capital murder if he murders more than one
person during the same criminal transaction.  Tex. Penal Code Ann. ' 19.03(a)(7)(A)
(Vernon 2003).  To convict Zavala of capital murder, the jury had to find
beyond a reasonable doubt that Zavala murdered Eladio Trevino and Oliver
Amilpas by shooting them with a firearm during the same criminal transaction.  See
id.   The jury was not asked to determine whether Zavala murdered Juan
Arturo Garcia.  Zavala asserts that the evidence is legally and factually
insufficient to support the verdict.  We disagree. 








When evaluating a legal-sufficiency challenge, we view the
evidence in the light most favorable to the verdict.  Wesbrook v. State,
29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  If any rational trier of fact
could have found the crime=s essential elements beyond a reasonable
doubt, we must affirm.  McDuff v. State, 939 S.W.2d 607, 614
(Tex. Crim. App. 1997). We do not resolve any conflict of fact, weigh any
evidence, or evaluate any witness=s credibility, as
this was the function of the trier of fact.  See Adelman v. State, 828
S.W.2d 418, 421 (Tex. Crim. App. 1992).  The jury may choose to believe or
disbelieve any portion of a witness=s testimony.  Sharp
v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  When faced
with conflicting evidence, we presume that the trier of fact resolved conflicts
in the prevailing party=s favor.  Turro v. State, 867
S.W.2d 43, 47 (Tex. Crim. App. 1993).  We may overturn the verdict only if it
is irrational or unsupported by proof beyond a reasonable doubt.  Matson v.
State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).  

          Zavala
asserts that the evidence does not show that Zavala himself pulled the trigger
on either of the weapons.  However, eyewitness testimony is unnecessary as long
as other evidence establishes guilt for the offense.  Greene v. State,
124 S.W.3d 789, 792 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d) (holding that A[i]dentity of a
perpetrator can be proved by direct or circumstantial evidence; eyewitness
identification is not necessary@).  Eladio Trevino, Oliver Amilpas, and
Juan Arturo Garcia were involved in a marijuana deal on the evening of July 2,
2003.  All three were found dead that same evening in the backseat of a red
truck.  Zavala=s left index fingerprint was found on the passenger
side of the truck.  Each man had multiple gunshot wounds.  

The crime-scene investigator recovered two calibers of
cartridge casings: nine-millimeter and .40-caliber.  Aleman-Salmon testified
that he saw Zavala in possession of a nine-millimeter Beretta on multiple
occasions before this incident, and that Zavala Awould always have
it on him.@  He also testified that Zavala mentioned that he
wanted to Aset up like a deal to rob people . . . a drug deal.@  Two of the men
had their hands bound behind them with twine, and one with flex-cuffs.  The
jury heard a description the material used for flex-cuffs and that such
material was found at Zavala=s place of business.  Amilpas=s sister testified
that she saw her brother with Zavala on July 2.  Aleman-Salmon heard that a
tall man who drove an Intrepid was seen with Amilpas on July 2.  This
description reminded Aleman-Salmon of Zavala.  Zavala drove an Intrepid and is
6 feet, 6 inches tall.  








On July 4, 2003, Officer Polzine stopped a Ford Windstar in
which Zavala was a passenger.  Officer Polzine located a nine-millimeter
Beretta underneath the passenger seat.  The firearms examiner confirmed that
the majority of the bullet parts submitted in this case matched the nine-millimeter
Beretta recovered from under the passenger seat in the Windstar.  Officer
Polzine also recovered 178 pounds of marijuana and $2,350, including $355 on
Zavala.  As the van was being transported to the impound facility, a
.40-caliber Beretta fell from underneath the dashboard.  This .40-caliber
Beretta also matched bullet parts submitted in this case.  Additionally, Zavala=s former cell-mate
testified that Zavala admitted he was caught with a Adirty@ gun that Ahad three murders.@  Zavala told his
former cell-mate that the sister of one of the deceased saw him with her
brother Abefore I did away
with him.@  Finally, Zavala told his cell-mate Athat=s what happen[s]
to people that [are] involved in this type of business . . . and don=t do the business
the way they should do it.@  

Zavala=s mother testified that her son was
driving a van on July 2, 2003, and not his Intrepid.  She also testified that
she had never seen a firearm in his room or at his place of business.  However,
the jury, as the trier of fact, is the sole judge of the weight and credibility
given to any witness=s testimony.  Fuentes v. State, 991
S.W.2d 267, 271 (Tex. Crim. App. 1999).  Considering all of the evidence, a
rational jury could have concluded beyond a reasonable doubt that Zavala murdered
Eladio Trevino and Oliver Amilpas in the same criminal transaction.  The
evidence is legally sufficient.  

Zavala argues that the jury should have been instructed on
the law of parties.  See Tex. Penal Code Ann. ' 7.01(a) (Vernon
1994) (stating that A[a] person is criminally responsible as a
party to an offense if the offense is committed by his own conduct, by the
conduct of another for which he is criminally responsible or by both.@); see also id.
at ' 7.02(a)(2)
(stating that a person is criminally responsible for an offense committed by
the conduct of another if Aacting with intent to promote or assist
the commission of the offense, he solicits, encourages, directs, aids, or
attempts to aid the other person to commit the offense@).  However, this
argument fails to acknowledge that in evaluating the sufficiency of the
evidence we consider a Ahypothetically correct charge.@  Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  








A hypothetically correct charge Aaccurately sets
out the law, is authorized by the indictment, does not unnecessarily increase
the State=s burden of proof or unnecessarily restrict the State=s theories of
liability, and adequately describes the particular offense for which the
defendant was tried.@  Id.  In Gonzalez v. State,
this court held that the Ahypothetically correct charge@ would include an
instruction of the law of the parties, where such charge did not unnecessarily
increase the State=s burden of proof, did not unnecessarily
restrict the State=s theories of liability, and adequately
described the offense.  63 S.W.3d 865, 873 (Tex. App.CHouston [14th
Dist.] 2001), aff=d, 117 S.W.3d 831
(Tex. Crim. App. 2003).  Because the evidence was legally sufficient under the
hypothetically correct charge, we affirmed the conviction. Id.  Here, if
we follow Zavala=s argument that the jury should have been
instructed on the law of parties, such instruction would already be included in
the Ahypothetically
correct charge@ considered on appeal.   Zavala=s own concession
in his brief that Ait is clear that the evidence is
sufficient to prove the appellant guilty of capital murder if he was charged as
a party or co-conspirator to the offense@ reaffirms our
determination that the evidence is sufficient to support the verdict.  

When hearing a factual-sufficiency challenge, we view all
the evidence neutrally.  See Cain v. State, 958 S.W.2d 404, 408
(Tex. Crim. App. 1997).  We especially discuss and examine the specific
evidence that the appellant contends undermines the jury=s verdict.  See
Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  We may
set aside the verdict if the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or if the verdict is against the great weight and
preponderance of the evidence.  Watson v. State, 204 S.W.3d 404, 414-15
(Tex. Crim. App. 2006).  We must not, however, intrude upon the fact finder=s role as the sole
judge of the weight and credibility given to any witness=s testimony.  See
Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).  We
may disagree with the jury=s conclusions; however, we must avoid
substituting our judgment for that of the jury, particularly in matters of
credibility.  See Watson, 204 S.W.2d at 414. 








Zavala contends that although the evidence was Aoverwhelming@ that he may have
participated in Athis conspiracy,@ an alternative
reasonable hypothesis is that Moises Borja or some other unknown person
actually pulled the triggers.  Although not determinative, the existence of an
alternative reasonable hypothesis may be relevant to a factual-sufficiency
review.   Wilson v. State, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999); Villani
v. State, 116 S.W.3d 297, 304 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d).  Considering this alternative
hypothesis, and conducting a neutral review of the evidence, we conclude that
the evidence is not so weak that the verdict is clearly wrong and manifestly
unjust and the verdict is not against the great weight and preponderance of the
evidence.  

Having disposed of the appellant=s issues, we
affirm the judgment of the trial court.                     

 

/s/      Jeff Brown

Justice

 

 

 

 

Judgment rendered and Memorandum
Opinion filed July 22, 2008.

Panel consists of Justices Yates,
Anderson, and Brown.

Do Not Publish C Tex.
R. App. P. 47.2(b).