**Marvin Lee WILSON, Appellant,**

v.

**The STATE of Texas**

**No. 73043.**

Court of Criminal Appeals of Texas.

Dec. 8, 1999.

J. D. Hamm, Beaumont, for appellant.

John R. DeWitt, Assist. DA, Beaumont, Matthew Paul, State's Atty., Austin, for the State.

## *OPINION*

KELLER, J., delivered the unanimous opinion of the Court.

In a trial beginning in January 1998, appellant was convicted of capital murder for the kidnapping and murder of Jerry Williams. Tex. Penal Code Ann. § 19.03(a)(2).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises fourteen points of error. We will affirm.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Guilt

In point of error four, appellant complains about the trial court's refusal to grant his motion for an instructed verdict of acquittal. In point of error five, appellant complains that the evidence is legally and factually insufficient to support his conviction.

The evidence showed the following: On November 4, 1992, Officer Robert Roberts and other police officers entered appellant's apartment pursuant to a search warrant. Jerry Williams was the confidential informant whose information enabled Roberts to obtain the warrant. Williams entered and left the apartment minutes before the police went in. Appellant, Vincent Webb,[3] and a juvenile female were present in the apartment. Over 24 grams of cocaine were found, and appellant and Webb were arrested for possession of a controlled substance. Appellant was subsequently released on bond, but Webb remained in jail. Sometime after the incident, appellant told Terry Lewis that someone had "snitched" on appellant, that the "snitch" was never going to have the chance to "to have someone else busted," and that appellant "was going to get him."

On November 9, 1992, several observers saw an incident take place in the parking lot in front of Mike's Grocery. Vanessa Zeno and Denise Ware were together in the parking lot. Caroline Robinson and her daughter Coretta Robinson were in-

---

1. The statute provides: "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit kidnapping...."

2. Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

3. Webb was sometimes known as "Gun."

side the store. Julius Lavergne was outside the store, but came in at some point to relay information to Caroline. The doors to Mike's Grocery were made of clear glass, and Coretta stood by the door and watched. Zeno, Ware, Coretta, and Lavergne watched the events unfold while Caroline called the police. These witnesses testified consistently although some witnesses noticed details not noticed by others.

In the parking lot, appellant stood over Williams and beat him. Appellant asked Williams, "What do you want to be a snitch for? Do you know what we do to a snitch? Do you want to die right here?" In response, Williams begged for his life. Andrew Lewis, Terry's husband, was pumping gasoline in his car at the time. Williams ran away from appellant and across the street to a field.[4]

Appellant pursued Williams and caught him. Andrew drove the car to the field. While Williams struggled against them, appellant and Andrew forced Williams into the car. At some point during this incident, either in front of Mike's Grocery, across the street, or at both places, Andrew participated in hitting Williams and appellant asked Andrew: "Where's the gun?" Appellant told Andrew to get the gun and said that he (appellant) wanted to kill Williams.[5] They drove toward a Mobil refinery. Zeno and Ware drove back to their apartments, which were close by, and when they arrived, they heard what sounded like gunshots from the direction of the Mobil plant.[6]

Sometime after the incident, appellant told his wife, in the presence of Terry Lewis and her husband, "Baby, you remember the nigger[7] I told you I was going to get? I did it. I don't know if he dead

or what, but I left him there to die." When Terry looked back at her husband, appellant stated, "Don't be mad at Andrew because Andrew did not do it. I did it."

On November 10, 1992, a bus driver noticed Williams' dead body on the side of a road. The autopsy report concluded that Williams died from close range gunshot wounds to the head and neck.

Having known appellant for 16 years, Zeno identified appellant. Lavergne and Coretta recognized Williams but did not know appellant or Andrew. Lavergne subsequently identified Andrew in a photo line-up. At that time, Lavergne told law enforcement authorities that the man he identified in the photo was the "helper," rather than the primary actor. The other man, who Lavergne described as having a "gerry curl," made the threats and conducted most of the beating of Williams. Under defense cross-examination at trial, Lavergne testified that the man in the photo (i.e. Andrew Lewis) was the man with the gerry curl and hence, the primary actor. But, upon redirect examination, Lavergne testified that his earlier testimony was in error, and that the man in the photo was not the one with the gerry curl.

This contradiction led to questioning that explored an incident involving Lavergne, defense counsel, and appellant. At one time, defense counsel and appellant interviewed Lavergne together, while Lavergne was in jail for an offense unrelated to the present case. No representatives of the district attorney's office were present. Appellant asked Lavergne for his father's name, and appellant asked if Lavergne had a new baby. These questions made Lavergne feel scared and intimidated, and he

---

4. Zeno characterized the location as a parking lot. The other witnesses characterized it as a field.

5. Some of the witnesses could not determine which man said, "Where's the gun?"—leaving open the possibility that Andrew may have made that statement.

6. Zeno testified that it was also possible that the sounds could have been produced by manufacturing processes at the Mobil plant.

7. The record established that appellant, Andrew, and Williams were black.

wondered how appellant could have known about Lavergne's new baby.

In evaluating legal sufficiency, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our review of the record shows ample evidence to support the conviction. Williams was the informant who caused appellant to be arrested for cocaine. Appellant could have inferred from Williams' presence at his apartment immediately before the police arrived that Williams had indeed "snitched" on appellant. That sequence of events established a motive for the murder. Appellant's statements to Terry Lewis and his later statements to Williams show that appellant intended to act upon that motive and kill Williams. Appellant assaulted and kidnapped Williams in front of several eyewitnesses, and later, appellant bragged that he had left the "snitch" to die. The latter statement could have been reasonably interpreted as an admission that appellant had in fact fulfilled his earlier threats to kill the victim. The short time frame in which these events occurred—a matter of several days—also supports the inference that these events were connected. And appellant's references to Lavergne's father and new baby reasonably could have been interpreted as a veiled attempt to influence Lavergne's testimony. Such an attempt to tamper with a witness is evidence of "consciousness of guilt." *See Ransom v. State*, 920 S.W.2d 288, 299 (Tex.Crim.App.1996)(opinion on rehearing).

Appellant contends that the only evidence supporting a finding of guilt was inadmissible hearsay testimony that was repudiated by in-court testimony. However, *all* evidence admitted at trial—including improperly admitted evidence—is considered in a legal sufficiency review. *Dewberry v. State*, 4 S.W.3d 735, 740–41 (Tex.Crim.App.1999); *Johnson v. State*, 967 S.W.2d 410, 412 (Tex.Crim.App.1998). Appellant does not explain what evidence he considers to be hearsay or why such evidence should be considered so weak that it would be insufficient to support a conviction under *Jackson*. Nor does he explain what testimony repudiates the hearsay testimony. And, while we have found the record to contain a number of out-of-court statements that support the verdict, most of those statements were made by appellant, and thus qualify as party-opponent admissions, which are not hearsay. Tex.R.Crim. Evid. 801(e)(2)(A). Likewise, eyewitness testimony concerning appellant's acts of beating and abducting Williams are not hearsay nor is the testimony concerning gunshot sounds.

Appellant also claims that the evidence is insufficient because it fails to exclude every outstanding reasonable hypothesis other than guilt. We have rejected the reasonable hypothesis construct as a measure of legal sufficiency. *Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim.App.1991).

In determining whether the evidence is factually sufficient to support the conviction, we must view all of the evidence, without the prism of "in the light most favorable to the prosecution," and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996). Although the existence of alternative reasonable hypotheses may be relevant to, but are not determinative in, a factual review, appellant cites no alternative hypotheses in his brief. And we perceive no reasonable hypotheses that would exculpate him. Only two possible hypotheses are present from the record. One is that Webb killed Williams or secured someone other than appellant to do so. Being present in the same drug bust with appellant, Webb possessed a similar motive to harm Williams. And Williams had

said to a police officer, "Gun's after me. I need to get out of here." But, the evidence established that Webb was in jail at the time of the murder. Besides a common motive and William's statement about "Gun," no evidence in any way implicated Webb in the murder. By contrast, appellant is strongly linked to the murder by his admissions and the kidnapping incident. The only other hypothesis is that Andrew acted alone or as the primary actor in killing Williams. There is no evidence that Andrew acted alone, and there is very little evidence that Andrew was the primary actor.[8] Most of the evidence points solidly to appellant as the primary actor who carried out the murder. And appellant does not point to, nor do we perceive, any other evidence of significant value exculpating appellant from the murder. The record fails to show that appellant's conviction was against the overwhelming weight of the evidence. The evidence is legally and factually sufficient to support appellant's conviction. Points of error four and five are overruled.

### B. Future dangerousness

 In point of error six, appellant contends that the evidence is legally insufficient to support the jury's affirmative answer to the future dangerousness special issue.[9] We utilize the *Jackson* standard for reviewing the legal sufficiency in this context: we view the evidence in the light most favorable to the jury's finding and ask whether any rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit further acts of violence that would constitute a continuing threat to society. *Brooks v. State*, 990 S.W.2d 278, 284 (Tex.Crim.App.1999). Factors relevant to determining whether the evidence

supports a finding of future dangerousness include but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence. *Id.* (citing *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim.App. 1987)). Although these factors are all relevant, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue." *Bell v. State*, 938 S.W.2d 35, 41 (Tex.Crim.App.1996), *cert. denied*, 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997).

 A rational jury could find that the circumstances of the crime indicate that appellant would commit future violent criminal acts. The murder in this case was a retaliatory act, committed against a person who exposed appellant's criminal activity. Appellant had been previously arrested twice for possession of cocaine: in April and November 1992. The presence of other individuals in appellant's home along with cocaine in November suggests the probability that appellant was a drug dealer. His act of killing Williams showed appellant's willingness to kill to further his criminal enterprise.[10] Moreover, appellant's statements to Terry Lewis about "getting a snitch" showed that the crime

---

**8.** Even if Andrew were the primary actor, appellant could still be guilty as a party. *See* Texas Penal Code § 7.02(a)(2).

**9.** That issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a

continuing threat to society." Article 37.071, § 2(b)(1).

**10.** Even if appellant were simply a drug user, however, his actions evinced a willingness to kill to enable his illegal activity to continue.

was a product of forethought and deliberation. And appellant appeared to be the primary actor, rather than someone who was acting under the domination of another. Further, the boldness of appellant's conduct—kidnapping the victim during the daylight hours in front of several witnesses—shows a personality that is especially unlikely to be deterred by the threat of legal sanction.

Appellant's background and character also indicate that he would probably be a future danger to society. Appellant was convicted of committing two aggravated robberies in 1981. In one of those aggravated robberies, he pointed a shotgun at the clerk of a convenience store. He was convicted of robbery in 1987. Several law enforcement agents who were familiar with appellant's reputation and character testified that appellant's reputation for being a peaceable and law abiding citizen was bad and that their opinion also was that his character was bad. David Froman, a Beaumont police officer, called appellant "a lawless person." Charles Little, who worked for the Jefferson County Sheriff's Department, stated that appellant was a "very violent person." And, appellant's statement after the murder, "Baby, you remember the nigger I told you I was going to get? I did it. I don't know if he dead or what, but I left him there to die," indicates a lack of contrition for the offense.

Also, appellant cannot claim his violence to be a passing part of his youth. He was thirty-four years old when he killed Williams. The evidence was legally sufficient to support the jury's finding of future dangerousness. Point of error six is overruled.

## II. GUILT / INNOCENCE

### A. Extraneous offense

In point of error seven, appellant contends that the trial court erred in admitting an extraneous offense without a proper and timely limiting instruction. In point of error eight, he complains that the trial court erred in admitting the extraneous offense without applying the appropriate Rule 403 balancing test. The offense in question is appellant's November 4th arrest for possession of cocaine.

At a pretrial hearing, appellant moved to suppress the cocaine-related evidence on the ground that the evidence was illegally obtained. After the trial court denied that motion, the parties and the trial court discussed the impact of Texas Rules of Evidence 404(b) and 403. The trial court stated that he believed, based upon the evidence at appellant's previous trial, that the extraneous offense would be admissible but reserved final judgment on the Rule 403 issue in case the events at trial required a different ruling:

> What the Court's going to do, because I recall a lot of the previous trial, based on what the evidence was in the previous trial, the Court's going to grant the State's request that this be admitted for the purpose of motive, but recognizing also that during the second trial it may not develop the same way. I want to have the chance to say it's more prejudicial than it is probative. But barring that, I'm going to admit it as of now; but I may change my ruling as the case develops during the trial.

In response, the defense attorney stated "in light of that and in anticipation of an adverse ruling, we would ask for a limiting instruction when the time is appropriate." The trial court responded, "Okay. And I request the State to approach the bench to advise the Court that he intends to put on that evidence, give the Court an opportunity to change its ruling and to grant the defense request that it not be admitted during the guilt/innocence phase."

During trial, a hearing was held outside the presence of the jury to determine whether the evidence was admissible. Defense counsel reurged his objections under Rules 404(b) and 403 but did not request a limiting instruction at that time. The defense attorney included, within his objec-

tions, a request for the trial court to conduct a balancing test. After hearing all of the defense objections, the trial court stated: "Court's going to overrule the defense objection and allow the extraneous offense of November the 4th to be admitted for the purposes of identity, motive, and intent." In the presence of the jury, appellant renewed his objections to the extraneous offense but did not request a limiting instruction. The trial court again overruled appellant's objections. A limiting instruction was included in the jury charge.

 Appellant has procedurally defaulted any claim with respect to a limiting instruction. The only time appellant ever requested a limiting instruction was at the pretrial hearing. The trial court did not appear to make a final ruling at that hearing. The trial court appeared to reserve the Rule 403 question, making a request for a limiting instruction premature. Appellant's counsel himself stated that he "anticipated" an adverse ruling, implying that such had not yet occurred. And the trial court required the State to approach the bench before delving into the subject matter. The trial court's action appears to be in the nature of a ruling on a motion in limine, which does not preserve error. *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex.Crim.App.), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994).

Moreover, even if the trial court's ruling were interpreted as a final ruling upon the admissibility of the evidence, appellant did not obtain an adverse ruling upon his request for a limiting instruction. The trial court answered appellant's request with "okay," which was either no ruling or a favorable ruling. Even if the trial court's response were interpreted as a favorable ruling, appellant was required to object when the circumstances appeared to show that the trial court's ruling was not being enforced. *See Moore v. State*, slip op. at 14 (Tex.Crim.App. April 21, 1999)(failure of court reporter to record bench confer-

ences after trial court had granted motion to have bench conferences recorded).

Further, appellant's request was not specific enough as to time; he simply asked for an instruction "when the time is appropriate" without indicating what he believed the appropriate time to be. The trial court did include a limiting instruction in the jury charge, which is one appropriate time for the instruction. Appellant did not express a clear desire for an instruction to be given contemporaneously with the admission of the evidence. Complaints must be alleged "with sufficient specificity to make the trial court aware of the complaint." Tex.R.App. P. 33.1(a)(1)(A).

As for appellant's allegation that the trial court failed to engage in a Rule 403 balancing test, the record does not show that the trial court failed to conduct such a balancing test. The trial court's discussion of the issue at the pretrial hearing indicates that the trial court *had* conducted a balancing test and determined that the evidence would be admissible if the presentation of the evidence did not deviate materially from what had occurred at appellant's previous trial. At trial, in the hearing outside the jury's presence, the trial court overruled appellant's objection but did not expressly rule upon appellant's request for a balancing test. Appellant did not ask the trial court to conduct a balancing test on the record, and appellant cannot exclude the possibility that the trial court conducted the balancing test in his mind.

Moreover, the extraneous offense evidence was so clearly admissible that we cannot perceive reversible error stemming from any failure to engage in a balancing test. Points of error seven and eight are overruled.

## B. Expert testimony

 In points of error nine and ten, appellant complains about the trial court's actions surrounding the admission of expert testimony from Steve Thrower, an

investigator with the Jefferson County Criminal District Attorney's office. Appellant contends that the trial court failed to conduct a proper gatekeeping analysis and that the evidence was inadmissible under Texas Rule of Criminal Evidence 702. Appellant's only objection regarding these matters occurred in the following colloquy:

> Q. Now, based on your training and experience, investigator, did you reach a conclusion as to the time that the victim in this case was shot?·
>
> A. Yes—
>
> [DEFENSE COUNSEL]: (Interrupting) Your Honor, I'm going to object to this. I'd like to take this subject under voir dire to determine if he is qualified to determine time, also have possibly a 705 hearing.

In response to defense counsel's request, the trial court convened a hearing outside the presence of the jury. Both the defense and the State elicited testimony from Thrower during this hearing. At the conclusion of the hearing, the trial court stated that he would allow the testimony. Appellant made no objections to the scope of the hearing or the manner in which it was conducted. Nor did appellant raise any objection to Thrower's qualification as an expert witness. Having failed to apprise the trial court of the claims he currently advances on appeal, appellant has procedurally defaulted those claims. Tex. R.App. P. 33.1(a)(1)(A). Points of error nine and ten are overruled.

### C. Exculpatory evidence

In points of error eleven and twelve, appellant contends that the trial court erred in failing to grant a continuance or a mistrial due to the State's tardy disclosure of exculpatory evidence. On February 18, 1998, at the conclusion of jury selection and five days before trial testimony began, the State disclosed that Williams had told Officer Clay Woodward that "Gun" was after him. According to the State's letter disclosing that fact, the State had believed that "Gun" referred to appellant and had

been unaware that "Gun" was Webb's street name until the State interviewed Webb that day. At trial, Webb testified that his street name was in fact "Gun." Woodward testified at trial that Williams related that "Gun" was after him. Woodward further testified that he asked Williams, "Who is Gun?" Williams replied, "You know, Big Merv, Marv, the guy you-all busted." The November 4, 1992 search warrant specified that the police expected to find "A black male known to Affiant as Gun. A black male known to affiant as Marvin Lee Wilson DOB 1/5/58. Described as 5'10", 175 #, and person or persons whose idetities (sic) are unknown to Affiant." The defense had previously been aware of the search warrant and had also known that Webb was arrested along with appellant in the drug raid occurring on November 4.

During the State's rebuttal portion of the guilt-innocence phase of the trial, the trial court conducted its hearing on the qualification of Thrower as an expert witness (see also part B above). During this hearing, defense counsel received several documents that were relied upon by Thrower in forming his opinions. One of those documents was a report by investigator C.D. Ashworth that was made on November 11, 1992. The report identified Webb as "Gun": "The one on the floor in the living room was identified as Vincent Dwayne Webb, aka-Gun and the one in the kitchen was identified as Marvin Lee Wilson." Based upon this information, defense counsel asked for a mistrial or a continuance. Defense counsel asserted that the defense team had been conducting an exculpatory evidence investigation since the State's disclosure on February 18, 1998 but needed more time to follow leads. The following colloquy ensued:

> THE COURT: But Mr. Gun was here to testify.
>
> [DEFENSE COUNSEL]: He did, Your Honor.
>
> THE COURT: I don't understand what more would you need for a continuance.

[DEFENSE COUNSEL]: Well, his friends, his other gang members, his other associations, things like that.

After further discussion, the trial court denied appellant's motions for mistrial and continuance.

Appellant now claims that the State's tardy disclosure violated his due process right to the disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, appellant has procedurally defaulted his claim. To preserve error, a complaint must be made to the trial court in a timely fashion. Tex.R.App. P. 33.1(a)(1). To be timely, a complaint must be made as soon as the grounds for complaint is apparent or should be apparent. *Hollins v. State*, 805 S.W.2d 475, 477 (Tex. Crim.App.1991). That subsequent events may cause a ground for complaint to become *more apparent* does not render timely an otherwise untimely complaint. *Id.* The State disclosed five days before the beginning of trial testimony the pertinent evidence, which consisted of: (1) Williams' statement about "Gun" being after him and (2) that Webb's street name was "Gun." Appellant was alerted at that time of the need to investigate Webb's friends and associates, and defense counsel stated that such an investigation was in fact begun after the State's disclosure. But appellant did not request a continuance before testimony began, nor did he request a continuance before he rested his case-in-chief. The only new information learned by appellant during the State's rebuttal was that the State first possessed evidence indicating that Webb was known as "Gun" much earlier than the State had represented in its February 18 letter. Such new information about when the State knew what it knew did not have any tendency to produce leads that had before been unknown to the defense team. Appellant acted untimely by waiting to request a continuance until after jeopardy had attached and both sides had rested their cases-in-chief.

Moreover, even if we considered appellant's complaint to be timely, his claim would fail. To prevail on his *Brady* claim, appellant must show that the State's tardy disclosure prejudiced him. *Little v. State*, 991 S.W.2d 864, 867 (Tex.Crim.App. 1999). To show prejudice, appellant must show a reasonable probability that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different. *Id.* at 866. For two reasons, appellant does not satisfy that showing. First, appellant had long been aware of other evidence that Webb possessed a motive to murder Williams. Webb was arrested along with appellant in the November 4, 1992 cocaine bust in which Williams was the confidential informant. And the arrest warrant appears to identify two men, "Gun" and appellant.[11] Knowing in 1992 that Webb had a motive for murder, appellant had ample time to conduct an investigation. Second, appellant failed to identify at trial what witnesses, other than Webb, would be called (presumably because he did not know). And appellant does not now explain, or point to anywhere in the record that explains, what witnesses he might have called had his attorneys been given further time to investigate. And appellant has not shown any reason to believe that additional witnesses exist. Points of error eleven and twelve are overruled.

### D. Jury argument

In points of error thirteen and fourteen, appellant contends that the prosecutor engaged in an argument that improperly

---

11. Because no descriptive characteristics are given for "Gun" while appellant's name, height, and weight are given after "Gun" is mentioned, a possible interpretation of the language in the warrant could be that appellant's name and description were intended to describe the person known as "Gun." However, parallel language in the warrant tends to discredit that interpretation: both "Gun" and appellant were introduced as "A black male known to affiant as ...."—indicating that two people were in fact being described.

struck at appellant over the shoulders of counsel and that argued matters outside the record. The complained-of argument, along with appellant's objections and the trial court's rulings, is set out as follows:

So, we go to Skunk No. 4. We go to—and it was not a skunk I expected. It was not a detour that I expected. And that detour was Julius Lavergne. And let me tell you, Julius Lavergne and the way that you, unfortunately, got the evidence that Julius Lavergne had to give you, it was truly unfortunate. To get the best information, ladies and gentlemen, from this witness stand is to try to get the case—try to get the case tried in a timely manner and don't fool with the witnesses. Don't—

[DEFENSE COUNSEL]: (Interrupting) Your Honor, I'm going to object to counsel's comment, "fool with the witness," as striking at the defendant over counsel's shoulder.

THE COURT: Sustain the objection.

[DEFENSE COUNSEL]: Would ask the jury be instructed to disregard counsel's comment.

THE COURT: Jury disregard the comment about the defense lawyers fooling with the witnesses.

[DEFENSE COUNSEL]: And we'd move for a mistrial.

THE COURT: Mistrial denied.

[PROSECUTOR continues]: You know, I have the same obligation to try to bring you good, credible witnesses. I have that obligation. And I cannot perform a showup like the kind—the evidence that you heard in this trial about Julius Lavergne being shown—this man being shown July Lavergne in the jail and bring that evidence to you. I couldn't do that. I couldn't. Picture this scenario. You got a guy sitting in jail, a Julius Lavergne, a young man, kid, who knows what he knows. I don't think he's bright. You folks may think he is. I think he's courageous, but he probably wasn't too courageous when he gets pulled out of that cell by these

defense lawyers and he gets brought face-to-face with a person that he had previously testified in another—

[DEFENSE COUNSEL]: (Interrupting) Your Honor, we're going to object to counsel's line of questioning here as referring to matters outside this record.

THE COURT: He's not questioning right now. You're saying he's questioning. I don't understand your objection.

[DEFENSE COUNSEL]: Well, he's stating testimony that is outside the record.

THE COURT: Sustain the objection that part.

[DEFENSE COUNSEL]: I'd ask the jury be instructed to disregard counsel's comment.

THE COURT: Jury disregard the comment—which part is outside the record?

[DEFENSE COUNSEL]: Where he was saying there was some kind of—brought out, showed things, contradicting testimony.

THE COURT: I'll sustain the objection, to be safe.

[DEFENSE COUNSEL]: Ask the jury to be instructed to disregard counsel's argument.

THE COURT: Jury disregard the argument that the defense counsel related to.

[DEFENSE COUNSEL]: And move for a mistrial.

THE COURT: Mistrial denied.

 Four permissible areas of jury argument are: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to the argument of opposing counsel; and (4) pleas for law enforcement. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex.Crim.App.1996). We have held consistently that arguments attacking defense counsel are improper because they unfairly inflame the jury against the accused. *Id.* at 59–60 (discussing cases). But the present case is distinguishable from those cases because the prosecution's argument was based upon the testimony of

a witness. Lavergne testified that defense counsel told him that appellant was not the primary actor in the kidnapping incident. Lavergne also testified that he was brought into a face-to-face meeting with the defendant and his attorneys. During this meeting, Lavergne was asked whether appellant was the man with the gerry curl or whether that man was the one in the photograph (Andrew Lewis). The evidence of appellant and his attorneys' involvement was relevant to show why Lavergne initially testified that the man in the photograph was the primary actor and why Lavergne later changed his testimony to say that appellant was the primary actor. The complained-of arguments were summations of the evidence and reasonable deductions from the evidence. Contrary to appellant's contention in point of error fourteen, the arguments were not outside the record. Contrast *id.* at 60 (attacks upon defense counsel were based upon matters outside the record).

In the present case, the witness changed his testimony and indicated that he had been influenced by defense counsels' conduct. The State was entitled to discuss those events to explain why Lavergne changed his testimony. Moreover, the testimony showed that appellant participated in some of the conduct involved. To the extent that appellant participated in the conduct, references to defense counsels' participation did not constitute an unfair strike at the defendant.

■■■■■ Further, even if the prosecutor's comments were improper, the trial court's instructions to disregard cured any error. Where arguments that strike over the shoulders of defense counsel are not particularly egregious, an instruction to disregard will generally cure the error. *Dinkins v. State,* 894 S.W.2d 330, 357(Tex.Crim.App.1995), *cert. denied,* 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59.

### III. PUNISHMENT

■■■ In points of error one and two, appellant contends that the death penalty scheme violates the United States and Texas constitutions by failing to require that a jury be informed that a person sentenced to life in a capital case would not be eligible for parole for thirty-five years. In point of error three, appellant contends that the trial court erred in denying appellant's request that the jury be instructed that a person sentenced to life in a capital case would not be eligible for parole for thirty-five years. We have held consistently that the United States and Texas constitutions do not require that a jury in a capital case be given such information. *Jones v. State,* 982 S.W.2d 386, 394 (Tex.Crim.App.1998)(citing *Smith v. State,* 898 S.W.2d 838 (Tex.Crim.App.)(plurality op.), *cert. denied,* 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995) and progeny). Points of error one through three are overruled.

The judgment of the trial court is affirmed.