

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-336-CR**

SHANNON WILLIAMS                                          APPELLANT

V.

THE STATE OF TEXAS                                             STATE

------------

FROM COUNTY CRIMINAL COURT NO. 2 OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

A jury found Appellant Shannon Williams guilty of driving while intoxicated (DWI), and the trial court assessed his punishment at sixty days in jail, probated for eighteen months, and a $750 fine. In two points, Williams contends that the evidence is factually insufficient to sustain his conviction and that the trial court erred by including the per se theory of intoxication in the jury charge. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

One night at approximately 1:18 a.m., Officer Nicholas Brown of the Fort Worth Police Department saw Williams's vehicle run a red light and change lanes without signaling. Officer Brown activated his overhead lights and stopped Williams. Officer Brown noticed that Williams had a "heavy odor of alcohol about him," bloodshot eyes, and slurred speech. Officer Brown asked Williams if he had been drinking, and Williams said he had consumed three or four beers that night.

Officer Brown called for a DWI Unit[1] and spoke with Officer Dena Evans, a DWI investigator who asked Officer Brown to begin field sobriety tests until she arrived. Officer Brown administered the horizontal gaze nystagmus test on Williams and, based on Williams's performance, concluded that Williams had alcohol in his system. When Officer Brown asked Williams to perform the walk and turn test, Williams refused and "just turned around, put his hands behind his back[,] and said, 'I'm not doing anything else.'" Officer Brown arrested Williams.

Officer Evans arrived at 1:36 a.m. and put Williams in her patrol car. She smelled an odor of alcohol on him. While en route to the jail, Williams lay down in the backseat of the patrol car. Officer Evans testified that "[Williams] was definitely

---

[1] Officer Brown explained that the Fort Worth Police Department's DWI Unit handles only DWIs and that, although he is qualified to investigate DWIs, the DWI Unit can process them in "half the time we can, just all the paperwork, being familiar with it."

passed out." When they arrived at the jail, Williams told Officer Evans that he was going to throw up and to hurry and let him out. Williams threw up in the sally port.

Officer Evans took Williams to the intoxilyzer room, where she had him perform the one-leg stand and walk-and-turn tests. Officer Evans testified that Williams was slow to respond to her instructions during the field sobriety tests. Williams swayed during the one-leg stand test. He could not keep his balance while listening to directions and while performing the walk-and-turn test, and he had to reach for the wall for support at one point.

Williams took the intoxilyzer test at approximately 2:46 a.m. and 2:48 a.m., about ninety minutes after Officer Brown had stopped him; the results of both tests showed that his alcohol concentration was 0.097 at that time.

Williams was charged by information with DWI "by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body or by having an alcohol concentration of at least 0.08."[2] At trial, Officer Brown, Officer Evans, and the senior forensic chemist for the Tarrant County Medical Examiner's office testified for the State. The State played two videotapes for the jury. State's Exhibit 1 is a videotape of the beginning of Officer Brown's stop of

---

[2] The penal code defines "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" (the impairment definition) or "having an alcohol concentration of 0.08 or more" (the per se definition). Tex. Penal Code Ann. § 49.01(2) (Vernon 2003).

3

Williams.[3] State's Exhibit 3 is a videotape of the inside of Officer Evans's car while she transported Williams to the jail and of Williams performing the field sobriety tests inside the intoxilyzer room. The State also introduced the results of Williams's intoxilyzer tests.

After both sides rested, Williams objected to the inclusion of the per se theory of intoxication in the jury charge, claiming that the State had failed to present any evidence that his alcohol concentration was 0.08 or more "*at the time Mr. Williams was driving.*" [Emphasis added.] The trial court overruled his objection and charged the jury on both the impairment and per se theories of intoxication. The jury entered a general verdict of "guilty" without specifying which definition of intoxication it found applied to Williams.

### III.  FACTUAL SUFFICIENCY OF THE EVIDENCE

In his second point, Williams argues that factually insufficient evidence existed that he was intoxicated under either of the two statutory definitions of intoxication. Specifically, Williams contends that "the State enjoyed a lower standard when attempting to prove the [impairment] definition of intoxication because the jury was allowed to consider convicting on insufficient evidence" and that factually insufficient evidence existed that his alcohol concentration was 0.08 or more for the per se definition of intoxication.

---

[3] Officer Brown explained at trial that the remainder of the stop was not recorded because the videotape ran out of tape.

4

## A. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1,

5

12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon*, 253 S.W.3d at 704. An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). The existence of an alternative reasonable hypothesis may be relevant to, but is not determinative in, a factual review. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999).

### B. Factually Sufficient Evidence

The impairment and per se theories of intoxication do not involve separate violations of the law. *Bagheri v. State*, 119 S.W.3d 755, 762 (Tex. Crim. App. 2003). Instead, they set forth "alternate means by which the State may *prove* intoxication, rather than alternate means of *committing* the offense." *Id.* When a trial court submits alternate means by which the State may prove intoxication, the evidence is

sufficient to support a general verdict of "guilty" if it is sufficient to prove any one of the alleged means. *Id.* at 762 n.5; *Reardon v. State*, 695 S.W.2d 331, 334 (Tex. App.—Houston [1st Dist.] 1985, no pet.). Consequently, in a factual sufficiency review, factually sufficient evidence of either theory of intoxication will support the jury's finding of guilt. *See Bagheri*, 119 S.W.3d at 762 n.5.

Here, because the jury could convict Williams if it found that he was driving while intoxicated under either the impairment or per se definition of "intoxicated" and because the jury entered a general verdict of "guilty," factually sufficient evidence of either theory will support the jury's finding. *See id*. egarding the impairment definition of "intoxicated," the evidence at trial demonstrated that Williams ran a red light and changed lanes several times without signaling. Officer Brown testified that Williams smelled of alcohol; that he had red, bloodshot eyes; and that he slurred his speech. The officer said that Williams had told him that he had consumed alcohol that evening. The officer also explained that Williams had failed the horizontal gaze nystagmus test, showing that he in fact had alcohol in his system. Officer Brown further testified that Williams had to lean against his vehicle for balance when talking to Officer Brown.

Officer Evans also smelled alcohol on Williams. She testified that Williams passed out on the way to the jail, and the videotape of Officer Evans's car shows

7

that Williams lay down in the back of the officer's car during the ride to the jail.[4]

Williams vomited when they arrived at the jail, and Officer Evans testified that his vomit smelled like alcohol. Officer Evans explained that during the field sobriety tests in the intoxilyzer room, Williams swayed and could not keep his balance. At one point, Williams had to grab the wall behind him to keep his balance while listening to the officer's instructions.[5]

Williams appears to argue that the State had a lower standard of proof regarding the impairment theory of intoxication because the jury could consider the results of Williams's intoxilyzer tests. The intoxilyzer results showing that Williams's alcohol concentration was 0.097 ninety minutes after his arrest, however, provided further evidence that Williams had consumed alcohol that night and were relevant to both theories of intoxication. *See State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (noting that results of intoxilyzer tests are probative of both per se and impairment theories of intoxication because they indicate whether defendant had consumed alcohol); *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004)

---

[4] The dissent contends that the videotape is contrary to Officer Evans's testimony and shows that Williams was not passed out. The videotape shows that Officer Evans left the scene for the jail at approximately 2:05 a.m. and that Williams lay down in the backseat at that time. He did not talk again or sit up until they arrived at the jail at 2:17 a.m., at which time he asked the officer to stop so that he could throw up. Thus, the videotape does not contradict Officer Evans's testimony that Williams was passed out.

[5] The dissent also asserts that the videotape contradicts Officer Evans's testimony about Williams's behavior in the intoxilyzer room. We find no contradiction between Officer Evans's testimony and the videotape.

8

(same); *see also Maxwell v. State*, 253 S.W.3d 309, 316–17 (Tex. App.—Fort Worth 2008, pet. ref'd) (holding, in sufficiency analysis, that absence of extrapolation evidence was irrelevant to jury's finding of guilt because jury was charged on both theories of intoxication).

Williams testified at trial and offered another explanation for some of his actions that night. He explained that he had eaten some sushi at a party, had felt sick, and had run the red light on purpose so that he could get home to throw up.[6] He also explained that he had changed lanes without using a blinker because he saw Officer Brown's car, thought the officer was in a hurry, and wanted to get out of his way. Although the jury could have found Williams's testimony to be true, the mere existence of a reasonable alternative hypothesis for his running a red light, changing lanes without signaling, and throwing up does not render the evidence factually insufficient. *See Wilson*, 7 S.W.3d at 141; *Love v. State*, 199 S.W.3d 447, 454 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

---

[6] The dissent takes issue with the fact that the video recording of the stop began after Williams ran the red light, stopped before Williams got out of his car, and did not include audio. No evidence in the record suggests that the videotape was not full or that Officer Brown intentionally turned off the videotape before getting out of his car. Instead, Officer Brown testified that the video "[j]ust ran out of tape" and that he did not realize it until he "took it out and placed it into property." He also testified that he did not recall if his patrol car that night was equipped with a microphone but that if it had one, he would have been wearing it. Any suspect motive on the part of the police to which the dissent alludes is not supported by the record and is not an issue raised in this appeal. *See* Tex. R. App. P. 47.1.

We have reviewed the evidence in a neutral light and have given due deference to the jury's determinations, particularly those regarding the witnesses' demeanor and credibility. We find no objective basis in the record to hold that the jury's verdict was clearly wrong or manifestly unjust or that it was contradicted by the great weight and preponderance of the evidence. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Rather, the evidence presented at trial was sufficient to support the verdict, and no contrary evidence exists that would render the evidence factually insufficient under the applicable standard of review. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Accordingly, we hold that the evidence is factually sufficient to support Williams's conviction.[7] We overrule his second point.

---

[7] The dissent claims that the evidence is factually insufficient to show that Williams was intoxicated at the time he was driving, but the evidence demonstrates that Williams ran a red light (a fact that he admitted at trial), admitted drinking alcohol that night (also a fact that he admitted at trial), lay down in the backseat of the patrol car (again, an admitted fact), vomited upon arrival at the jail (yet again, an admitted fact), and failed field sobriety tests and the intoxilyzer test. Viewing the evidence in a neutral light, favoring neither party, this evidence is certainly not "so weak that the factfinder's determination is clearly wrong or manifestly unjust." *See Lancon*, 253 S.W.3d at 704.

## IV. JURY CHARGE

In his first point, Williams contends that the trial court erred by including the per se theory of intoxication in its charge to the jury because the State presented insufficient evidence to show what his alcohol concentration was at the time he was driving.

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. *See id.* at 731–32. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.*

The jury charge must distinctly set forth the law applicable to the case. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007). The trial court errs when it charges the jury on a theory of conviction that is not supported by the evidence. *Sanders v. State*, 814 S.W.2d 784, 787 (Tex. App.—Houston [1st Dist.] 1991, no pet.).

Here, as we explained in our factual sufficiency review above, the results of intoxilyzer tests are relevant to both theories of intoxication because they may show that a defendant has consumed alcohol and thus "tend to make it more probable that [the defendant] was intoxicated at the time of driving." *Mechler*, 153 S.W.3d at 440; *see Stewart*, 129 S.W.3d at 96. The court of criminal appeals recently explained,

> BAC-test results, even absent expert retrograde extrapolation testimony, are often highly probative to prove both per se and

11

impairment intoxication.[8]  However, a BAC-test result, by itself, is not sufficient to prove intoxication at the time of driving.  There must be other evidence in the record that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test. . . .  Other evidence that would logically raise an inference that the defendant was intoxicated at the time of driving as well as at the time of the BAC test includes, *inter alia*, erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, any admissions by the defendant concerning what, when, and how much he had been drinking—in short, any and all of the usual indicia of intoxication.

In sum, the evidence is sufficient to support a jury charge on the "per se" theory of intoxication if it includes either (1) expert testimony of retrograde extrapolation, or (2) other evidence of intoxication that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test.

*Kirsch v. State*, No. PD-0379-09, 2010 WL 447437, at *4–5 (Tex. Crim. App. Feb. 10, 2010).[9]

Here, the jury heard evidence that Williams ran a red light and changed lanes without signaling; smelled of alcohol; had red, bloodshot eyes; slurred his speech; leaned on his vehicle for balance; and said he had consumed alcohol that evening. The jury also heard evidence that Williams passed out on the way to the jail, vomited upon arrival, and failed field sobriety tests.  Following *Kirsch*, we hold that this evidence "support[s] an inference that [Williams] was intoxicated at the time of

---

[8] "Extrapolation evidence explains the correlation between the breath test results and the level of intoxication at the time of the arrest in a given case." *Martin v. Dep't of Pub. Safety*, 964 S.W.2d 772, 776 (Tex. App.—Austin 1998, no pet.).

[9] The court of criminal appeals issued its opinion in *Kirsch* after Williams filed this appeal.

driving as well as at the time of taking the breath test." *Id.* Consequently, the intoxilyzer results, when coupled with the other evidence at trial, were sufficient to support a jury charge on the "per se" theory of intoxication. *See id.* We overrule Williams's first point.

## V. CONCLUSION

Having overruled both of Williams's points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED: March 4, 2010

13



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-336-CR

SHANNON WILLIAMS                                                      APPELLANT

V.

THE STATE OF TEXAS                                                           STATE

------------

FROM COUNTY CRIMINAL COURT NO. 2 OF TARRANT COUNTY

------------

## DISSENTING OPINION

------------

I write separately because I do not understand the record in the same way the majority understands it, and I find that record terribly disturbing.  The majority accurately reports and relies on the testimony at the trial, but the testimony is contradicted by the video record of the actual events.

Patrol Officer Nicholas Brown pulled Appellant Shannon Williams over and then called for the officer who was trained to investigate suspected offenses of driving while intoxicated (DWI), even though he was trained to conduct the horizontal

gaze nystagmus (HGN) test. Officer Brown's car either had no microphone or had the microphone turned off. He testified,

> Q. Now, officers do have mikes [sic], don't they?
>
> A. Some of the vehicles are equiped [sic] with them, some aren't.
>
> Q. And this vehicle is not equiped [sic] with a mike [sic]?
>
> A. I believe not. I don't recall. If it did have one, I would have been wearing it.
>
> Q. So if there was a mike [sic], we could have heard his voice, correct?
>
> A. Yes, sir."[1]

Officer Brown testified that there was a video camera, but he "ran out of tape" before the film could capture Appellant's ability to walk and to exhibit whether he had lost the normal use of his mental or physical faculties at the time he was operating the motor vehicle. Officer D. Evans, the second officer, believed that she had turned her car's microphone off. She was mistaken. The regularity with which the units working the Camp Bowie area have no dash cameras or have malfunctioning equipment or officers who cannot remember whether they did not have the equipment or simply chose not to use it is, indeed, disturbing.

Officer Brown of the Fort Worth Police Department was on duty in approximately the 9100 block of Camp Bowie Boulevard at approximately 1:18 a.m. on October 19, 2007. He testified that he saw a blue pickup driven by Appellant and

---

[1] RR Vol.II at 29–30.

traveling west on Camp Bowie run a red light at the intersection of Camp Bowie and Normandale. Officer Brown pulled his patrol vehicle behind the pickup and began to follow it. He said that he saw Appellant change lanes twice without signaling. Officer Brown then activated his dash camera. The video shows the blue pickup pull on to the access road of Loop 820 and then pull over to the side of the road without incident. Officer Brown testified that he smelled the odor of alcohol and that Appellant had bloodshot eyes and slurred speech. Although there is no sound on the videotape, Officer Brown testified that in response to his questions, Appellant said that he had consumed three or four beers. Officer Brown testified that he had asked Appellant for his driver's license and insurance and that Appellant had no problem providing the driver's license. Officer Brown had no independent recollection of Appellant's providing the insurance information.

Officer Brown called for a DWI unit and spoke with Officer Evans, who told him that she was some distance away and asked him to go ahead and perform the field sobriety tests. At some point, while Officer Brown was in his unit and Appellant was still in his pickup, the video recording in Officer Brown's car stopped.

Officer Brown denied that Appellant had any particular problem getting out of the pickup or that he had to hold on to the pickup to maintain his balance. He did claim that Appellant at some point was forced to lean against the pickup to maintain his balance. Again, these actions are not reflected on the videotape because it had already stopped. According to his testimony, Officer Brown administered the HGN

2

test, concluding that Appellant had alcohol in his system and scored six "clues" of intoxication. Officer Brown testified that at that point, Appellant said that he was not going to perform any further tests and put his hands behind his back to be handcuffed.

Appellant testified that he had been at a birthday party for a short time, approximately two hours, and had eaten some sushi that had made him sick. He testified that he told Officer Brown that he was feeling sick and could not continue the field sobriety tests. Of course, because the video equipment in Officer Brown's car had stopped, the evidence at this point was a swearing match. Appellant also testified that as he was driving west on Camp Bowie, Officer Brown pulled out of a parking lot and followed very closely behind him. Assuming that Officer Brown wanted to pass him, Appellant pulled over into a different lane. When Officer Brown did not make an attempt to pass him, Appellant pulled back into his lane in preparation for entering the access road for Loop 820 because he was intending to return home by way of the loop. The videotape does reveal that Appellant did not signal any lane changes. There were no vehicles around, other than Officer Brown's, and there was no testimony or other evidence that Appellant could not change lanes safely without signaling.

Officer Brown testified that he had pulled Appellant over because of his running a red light and his erratic driving. Appellant admitted that he ran a red light, and he does not challenge the original stop. But the limited amount of driving

3

recorded on the videotape is neither erratic nor unsafe and in no way indicative of intoxication.

Officer Evans testified that she arrived at the scene of the traffic stop at 1:36 a.m. She took custody of Appellant and placed him in the back of her patrol car. Officer Evans testified that she smelled the odor of alcohol on Appellant, that his eyes were bloodshot, and that his speech was slurred. She also testified that he passed out in the back seat of her vehicle. She further testified that the microphone in her car was not on.

I have closely reviewed the videotape from Officer Evans's car and find that, indeed, the microphone was turned on. One can hear Appellant speaking. His speech is not slurred. Indeed, his speech is clear, cogent, and coherent. He asks the officers to retrieve his billfold from his truck. He explains that he owns his own business and needs the billfold. He describes the billfold as being brown and looking like a large checkbook and tells the officers how much he appreciates their getting it for him. He asks what is going to happen to him and explains that he has never been in any kind of trouble before. He tells the officers that his handcuffs are too tight and are making his hands numb. He asks if they will cuff his hands in front. They, of course, refuse. We see him lie down on the back seat, but he has not passed out. Indeed, he continues to speak. He asks what is going to happen to him and what the next procedures will be. He asks if he can get someone to come get it, presumably his truck in the context of the events. After a short time, he thanks

4

Officer Evans for turning on the air for him. There is a period of silence while someone drives the patrol car. Officer Evans does not speak to Appellant, and he neither speaks nor sings to her. There is no sound of snoring, and Appellant is not visible. Neither Officer Evans nor the majority suggests that she has passed out because she does not speak and is not visible on the tape.

As the car pulls into the sally port, Appellant says that he feels very sick and asks the officer to stop because he feels that he is going to vomit. His speech is not slurred, nor does he sound inebriated. He then asks the officer to please let him out of the car because he feels that he is going to vomit. Nowhere is Officer Evans's testimony that Appellant passed out or that his speech was slurred supported by what we see or hear on the videotape. In fact, her testimony is contradicted by what we see and hear.

When Officer Evans pulled into the sally port at the jail, she opened the car's back door for Appellant, and he was allowed to vomit outside the police car. Nothing in the record suggests that Appellant was given anything to drink or anything with which to rinse the vomit out of his mouth before he submitted to the intoxilyzer test.

Officer Evans took Appellant inside the jail to the intoxilyzer room. The events in the intoxilyzer room were videotaped. Again, the difference between the officer's description of Appellant's performance on the field sobriety tests and the performance revealed on the videotape suggests that we are talking about totally different cases. At trial, Officer Evans described Appellant as unable to stand

5

without swaying or holding on to the wall and unable to properly perform the field sobriety tests. The videotape reveals that Appellant swayed less than the officer and that Appellant performed substantially better than she did on the field sobriety tests.

At trial, Officer Evans stated that Appellant was unable to maintain a stance with one foot in front of the other, but the videotape shows that she took an inordinately long time explaining the test, repeating herself, while instructing him to stand in a very unnatural position that he eventually abandoned while he waited for her again to repeat the instructions. When Appellant did perform the test, he performed quite well. The video also demonstrates that his speech is not slurred, although he does appear quite tired.

Officer Evans testified that Appellant had a slow response to instructions, justifying her conclusions that he had lost the normal use of his mental faculties. The video shows that every time he attempted to respond to her instructions, she told him to wait because she was not finished instructing him. Appellant did tell Officer Evans that he felt claustrophobic. Officer Evans opened the door to the intoxilyzer room.

Appellant agreed to take a breath test, and the test revealed a blood alcohol concentration of 0.097 at 2:46 a.m., approximately ninety minutes after Appellant was pulled over. Appellant was ultimately charged with DWI by not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body or by having an alcohol concentration of at least 0.08.

6

The majority relies on the officers' testimony to the exclusion of the contradictory evidence of the video record. While determinations of credibility are the exclusive province of the trier of fact,[2] an objective record of the actual events that contradicts the testimony must mean that the record does not support the trial court's determination of facts.

Repeatedly, we are asked to review records of DWI stops during which there is no audio or video record of the event. In *Cendejas-Fernandez v. State*, concerning another DWI stop in the 9100 block of Camp Bowie, the officer could not remember whether he had failed to turn on his camera or whether he had no camera.[3] In *Helm v. State*, the officer provided neither audio nor video record of the detention.[4] And so it goes on Camp Bowie in Fort Worth.

Why do I believe there should be audio or audio and video record of the DWI stops? Because the law requires, and did so at the time of this stop, either an audio or audio and video record or the filing of a racial profiling report for each stop.[5] The

---

[2] *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006).

[3] No. 02-08-00388-CR, 2010 WL 520810, at *5, *7 (Tex. App.—Fort Worth, February 11, 2010, no pet. h.) (Dauphinot, J., dissenting).

[4] 295 S.W.3d 780, 785 (Tex. App.—Fort Worth 2009, no pet.) (Dauphinot, J., dissenting). The reporter's record in *Helm* contains the officer's testimony indicating that he was at the intersection of Marquita and Camp Bowie when he observed Helm's driving.

[5] *See* Tex. Code Crim. Proc. Ann. art. 2.133–.135 (Vernon Supp. 2009).

7

City of Fort Worth has conscientiously provided the means for complying with this law. Since at least 2004, Fort Worth has been providing in-car video cameras to police officers:

> The Police Department currently has cameras in more than 240 marked Police vehicles. These include all Front Line Patrol (Beat) Vehicles, Traffic Division DWI unit, Commercial Vehicle Enforcement unit, and twelve vehicles assigned to Zero Tolerance Teams. The number of cameras nearly doubled during FY2004 due to a State grant that provided 99 additional units. This program will continue equipping vehicles requiring in-car video cameras increasing from 181 to 249 Front Line Patrol (Beat) Vehicles in FY2008-2009.
>
> The Police Department will begin equipping Digital In-Car Video systems in FY09. The quantity of the Digital systems will be limited while tests and evaluations of various models are conducted. This will allow the department to ensure that the equipment meets the requirements of the Police Department, as well as the Prosecutors [sic] Office, maximizing the ability to prosecute cases using recorded video evidence.[6]

I cannot agree with the majority that there is no conflict between the testimonial evidence and the record of the actual events. An appellate court should give no weight to testimony that is disproved by the objective record of the actual events. And I believe that the majority should address the issue of an officer's intentionally disabling the audio recorder and testifying directly contrary to the audio record.

---

[6] Fort Worth Crime Control and Prevention District Plan Executive Summary FY 2010, IV. Police Department Enhancements, K. In-Car Video Cameras 10 (April 17, 2009), http://www.fortworthgov.org/council_packet/render_file.asp?filename=11505/CCPD+Executive+Summary+CCPD+Budget+FY10.doc.

8

At some point, courts must address the repeated failure of officers to use the recording equipment and their repeated inability to remember whether the car they were driving on patrol or to a DWI stop contained the video equipment the City of Fort Worth has been paying for. If the law requires recording to qualify for the exception to filing racial profiling reports,[7] then is the officer not obligated to make sure that there is tape in a traditional video camera or that a digital camera is activated? When the actual recording conflicts with the officer's testimony, the defendant's testimony, or another witness's testimony, a court cannot pretend that the emperor is wearing new clothes just because someone testifies that he is.

The issue before this court is whether Appellant was intoxicated at the time he operated a vehicle in a public place, not whether the alcohol concentration in his body was above .08 ninety minutes after he stopped driving. Both officers had microphones and a video camera, yet we have no video record of Appellant's control of his physical faculties at the scene. Given Officer Evans's testimony that her microphone was off, we are fortunate to have an audio record. That accidental record reveals no indication of inebriation on Appellant's part. I must respectfully disagree with the majority that lying down is evidence of intoxication, especially in light of the fact that when Appellant was sitting up against the back of the seat, he had indicated that having his hands handcuffed behind him was painful and asked to be handcuffed in front. Further, despite Officer Evans's testimony that a person's

---

[7] *See* Tex. Code Crim. Proc. Ann. art. 2.135.

going to sleep because he is tired is, in her opinion, the same thing as passing out,

I cannot agree that lying down is the same thing as passing out. The two are quite

different.

There is no record of the alcohol concentration in Appellant's body at the time

he was driving. The only record of the alcohol concentration in Appellant's body was

made more than an hour and a half after he stopped driving, and that record was

made after he had vomited.[8] It is common knowledge that even burping can

invalidate intoxilyzer test results.[9] Officer Evans testified that if a person burped or

vomited during the fifteen-minute observation period before beginning the intoxilyzer

test, the observation period had to begin again, although she did not know why. I

---

[8] *See* 37 Tex. Admin. Code § 19.4.(c) (2006) (Tex. Dep't of Safety, Breath Alcohol Testing Regs.) ("All breath alcohol testing techniques, in order to be approved, shall meet, but not be limited to, the following: (1) a period during which an operator is required to remain in the presence of the subject. An operator shall remain in the presence of the subject at least 15 minutes before the test and should exercise reasonable care to ensure that the subject does not place any substances in the mouth."); *Heeth v. State*, No. 01-94-00975-CR, 1997 WL 212268, at *3 (Tex. App.—Houston May 1, 1997, no pet.) (not designated for publication) ("In the present case, Deputy Whitley explained that the state requires officers to observe a DWI arrestee for fifteen minutes prior to administering the intoxilyzer test to make sure that he consumes no more alcohol, introduces no other substances into his mouth, and does not vomit. All of these acts would affect the results of the intoxilyzer test.").

[9] *See, e.g.*, *Pastrano v. State*, No. 04-95-00268-CR, 1996 WL 382983, at *1 (Tex. App.—San Antonio July 10, 1996, no pet.) (not designated for publication) ("The intoxilyzer expert testified that a burp which brought up liquid could affect the results although a burp which only brought up vapor from the stomach would have no effect."); *Hujar v. State,* No. 01-94-00024-CR, 1995 WL 431503, at *4 (Tex. App.—Houston [1st Dist.] July 20, 1995, no pet.) (not designated for publication) ("Officer Jones testified that if a subject belched or burped before a test it could bring up residual alcohol from the stomach and cause a falsely high reading. He testified that if a subject burps, he must start the 15-minute waiting period over.").

10

would submit that the observation properly begins again only if no residue of vomit is left in the mouth. As long as there is residue of the vomit, the testing cannot be said to be wholly reliable. And the majority may be correct that if a valid test reveals a breath alcohol level of .09, that is some evidence there was alcohol in the body when the subject was driving. But, realistically, if, at the time the test is performed, there is no evidence to show whether the body was in the absorption mode or the dissipation mode, there is no way to tell whether the alcohol concentration in the body was higher, lower, or the same when Appellant was operating his truck. In this case, there is the additional problem of Appellant's having vomited and no evidence that the vomit residue had been cleared from his mouth when he breathed into the tube of the intoxilyzer. As the majority points out, no one attempted to prove Appellant's blood alcohol level at the time he was operating the vehicle.

The issue is not whether Appellant could properly be cited for a traffic violation or whether there was some evidence that would allow a jury to suspect that he had been drinking, but whether the State proved beyond a reasonable doubt that he was intoxicated when he operated the vehicle. The State did not.

For these reasons, I cannot join the majority's well-written opinion and must respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: March 4, 2010

11